560 F.2d 579
 15 Fair Empl.Prac.Cas. 471, 14 Empl. Prac.
Dec. P 7783,
1 Fed. R. Evid. Serv. 1046
 Thomas C. WARD, Appellant in No. 75-2179,
v.
ALLEGHENY LUDLUM STEEL CORPORATION, a Division of Allegheny
Ludlum Industries, Inc., Appellant in No. 75-2178,
and
United Steel Workers of America Local 1196, and United
Steelworkers of America, International.
 
 Nos. 75-2178, 75-2179.
 United States Court of Appeals,
Third Circuit.
 Argued May 25, 1976.
Decided Aug. 3, 1977.
 Robert N. Hackett, Joan P. Feldman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for Thomas C. Ward.
 Robert L. Frantz, R. A. King, Lewis U. Davis, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for Allegheny Ludlum Industries, Inc.
 Brian K. Landsberg, Walter W. Barnett, John C. Hammock, Attys., Dept. of Justice, Washington, D.C., for U.S., as amicus curiae.
 Before ADAMS, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM:
 
 
 1
 This appeal poses a difficult question concerning the degree to which Title VII of the Civil Rights Act of 1964, as amended, requires an employer to accommodate the religious beliefs of its employees.[1] Inasmuch as the Supreme Court in Trans World Airlines, Inc. v. Hardison[2] has provided new guidelines for such inquiry, we vacate the judgment of the district court and remand for reconsideration in light of that case.
 
 I.
 
 2
 Although the fact pattern of this litigation presents many tangles, it is susceptible to a succinct description. Thomas Ward has been an employee of Allegheny Ludlum Steel Corporation, a manufacturer of specialty steel, since 1965. In 1968, he commenced an apprenticeship in the hydraulic and engine repair gang and by 1972 had attained the rank of Class "A" journeyman.[3] After achieving this latter position, Ward was assigned to the "twenty-week schedule" at Allegheny's Tandem Mill.
 
 
 3
 The Tandem Mill is a critical link in Allegheny's operations and must function twenty-four hours a day, seven days a week. Four Class "A" hydraulic and engine repair journeymen are assigned to the Mill and a journeyman must be on duty at all times. Thus, if a worker who is assigned to the Tandem Mill is absent from a designated shift, Allegheny must procure a substitute journeyman. A twenty-week rotation schedule has been fashioned in order to insure that one person will be present at each shift and that the four journeymen will have two days off each week.[4]
 
 
 4
 Allegheny's collective bargaining agreement with the United Steelworkers of America provides the method for filling the four Class "A" journeymen slots at the Tandem Mill. First, volunteers are sought. Then, if they are insufficient volunteers, those journeymen with the least seniority are assigned to the Mill.[5]
 
 
 5
 In 1970, Ward began to study the beliefs of the Worldwide Church of God and was ultimately baptized into that faith. One of the principles of the religion is that the Sabbath, which is celebrated from sundown Friday to sundown Saturday, is a day of rest on which no work may be done.
 
 
 6
 When Ward was transferred to the Tandem Mill in July, 1972, a conflict between his religious beliefs and his work schedule arose. This was so since the rotation would often require him to work shifts that coincided, in whole or in part, with his Sabbath. Consequently Ward refused to work these shifts. At first, and on his own motion, Ward procured substitutes for himself.[6] Allegheny, however, instructed him to cease this practice.
 
 
 7
 Ward's record of absenteeism led to an escalating sequence of disciplinary measures which culminated in a suspension in December, 1972. At the hearing which followed the suspension, Ward was told that Allegheny would not permit him to design a special schedule for working at the Tandem Mill, since such a plan would constitute "reverse discrimination." Allegheny did renew an offer to Ward of a job in the Plant Protection Department as a janitor.[7] Under such an arrangement, Ward would not have to work on his Sabbath, although he would be on duty on Sundays. It was made clear to Ward that if he did not accept this offer he would be discharged. Ward took the janitorial position, but simultaneously wrote a letter of protest to the company.
 
 
 8
 With these events forming the backdrop, Ward filed with the Equal Employment Opportunities Commission a complaint against Allegheny and the United Steelworkers.[8] The EEOC issued a right-to-sue letter and Ward commenced an action in the district court alleging violations of Title VII.
 
 
 9
 After a non-jury trial, Judge Gourley entered judgment for Ward against Allegheny, but rejected the claim against the Union.[9] The district court ruled that Allegheny had failed reasonably to accommodate Ward's religious beliefs,[10] and that it had not demonstrated that such accommodation would subject it to undue hardship.[11] Judge Gourley also decided that Title VII, as he construed it, did not transgress the establishment clause of the First Amendment. This appeal followed.[12] It has been held under advisement pending the decision of the Supreme Court first in Parker Seal Co. v. Cummins[13] and then in Trans World Airlines Co. v. Hardison.[14]
 
 II.
 
 10
 The recent opinion of the Supreme Court in Trans World Airlines, Inc. v. Hardison[15] supplies, for the first time, a definitive interpretation of the requirement of Title VII that employers accommodate the religious beliefs of employees. The facts of that case may be stated briefly.
 
 
 11
 Hardison was a clerk in the Stores Department at the TWA maintenance and overhaul base in Kansas City, Missouri. The Stores Department, because of its important position in the functioning of the Kansas City base, must be open and manned twenty-four hours a day, every day of the year. Consequently, whenever a vacancy arises in the department, it is necessary to shift another employee in order to fill the gap.
 
 
 12
 Work assignments at the Kansas City base were governed by a collective bargaining agreement. The key variable in the arrangement was seniority. As a result, the most junior employees were compelled to work at jobs and shifts for which there had been no volunteers.
 
 
 13
 Subsequent to the time he commenced work with TWA, Hardison converted to the faith of the Worldwide Church of God. As previously indicated, the tenets of this religion forbid the performance of any work from sundown Friday to sundown Saturday.
 
 
 14
 Hardison immediately informed a TWA official of the problem posed by his religious beliefs. The official stated that he would discuss this matter with the Union and attempt to arrange a job swap which would permit Hardison to observe his Sabbath. The job swap was worked out and Hardison was given a new assignment that was comparable to his former position.
 
 
 15
 The solution, however, soon unraveled when Hardison obtained a transfer to a new unit, where he was the second most junior employee. When the junior worker went on vacation, Hardison was asked to work on Saturdays. He refused. TWA then attempted to obtain the Union's approval for a change of work assignment but the Union was unwilling to countenance a breach of the seniority provisions of the collective bargaining agreement. All other compromise suggestions proved to be unacceptable to TWA and Hardison was ultimately discharged.
 
 
 16
 He then brought suit against TWA and the Union, alleging violations of Title VII.[16] The district court ruled for the defendants,[17] but the Eighth Circuit reversed the judgment in favor of TWA.[18] The decision of the Eighth Circuit was grounded on the conclusion that TWA had not reasonably accommodated Hardison's beliefs and that it had failed to make out a case of undue hardship.[19]
 
 
 17
 In an opinion by Mr. Justice White, the Supreme Court reversed. It initially stated that TWA had made substantial efforts to accommodate Hardison.[20] Justice White, in particular, noted that the company originally had obtained a new position for him in order to permit him to observe his Sabbath and had later endeavored to work out a further job swap. The union, however, proved to be unwilling to cut across the seniority rights of other employees.
 
 
 18
 Justice White then turned to the task of assessing the content of the reasonable accommodation and undue hardship provisions of Title VII. First, he declared that Title VII did not require an employer to undertake activity which would violate a bona fide seniority system in the name of accommodation.[21] The Court also stated that an employer was not obligated to take accommodation steps which would require it to bear costs, such as overtime pay for replacements, if such costs are more than de minimus.[22]
 
 III.
 
 19
 Since the Hardison Court has enunciated legal standards that diverge from those utilized by Judge Gourley,[23] the judgment of the district court in this case must be vacated.
 
 
 20
 Several factors indicate that the proceeding should be remanded for reconsideration by the trier of fact. The most compelling reason for such a disposition is the paucity of the district court's findings of fact, particularly as they pertain to several matters crucial to the application of the teachings of Hardison to this case.
 
 
 21
 It appears to us that the need for clarification of the factual record is most pressing with regard to the two factors that the Hardison Court identified as pivotal to the existence, vel non, of undue hardship for the purpose of Title VII. As to the ramifications of the seniority provisions of the collective bargaining agreement, although much testimony touching on this issue was adduced, the district court did not make any relevant findings of fact. And with regard to the cost of overtime wages for workers who might stand in for Ward at the Tandem Mill on shifts that conflicted with his Sabbath, the district court entered no findings, even though Ward's counsel presented testimony that the total cost of such an arrangement would be $850.[24] Without a resolution of the possible cost of obtaining replacements for Ward, it is inappropriate to determine whether the burden of such a course of action is de minimus for purposes of the Hardison test.
 
 
 22
 Accordingly, the judgment of the district court will be vacated and the cause remanded for proceedings consistent with this opinion.[25]
 
 
 
 [1]
 42 U.S.C. § 2000e-2(a)(1)-(2) provides:
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 42 U.S.C. § 2000e(j) provides:
 (j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 
 
 [2]
 --- U.S. ----, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)
 
 
 [3]
 At the time of the incidents relevant to this litigation the hydraulic and engine repair gang consisted of 32 persons, and approximately 20 were Class "A" journeymen
 
 
 [4]
 It should be noted that the days and shifts that the four journeymen assigned to the Tandem Mill will work is constantly rotated
 In contrast to the schedule at the Tandem Mill, the remainder of the members of the engine repair gang work what is known as the "six-week schedule." All persons work one shift, 8:00 A.M. until 4:00 P.M., and have Sunday and one other rotating day off per week. It also appears from the record that Allegheny ordinarily will not replace absentees from the six-week schedule.
 
 
 [5]
 The length of a Class "A" journeyman's assignment to the Tandem Mill is wholly a function of seniority. He will be transferred to the six-week schedule when there are a sufficient amount of Class "A" journeymen who are junior to him in seniority. The record seems to indicate that Ward would have been transferred out of the Mill in April, 1973
 
 
 [6]
 Evidence was produced at trial which indicated that many of Ward's colleagues were willing to fill in for him. The record is unclear, however, as to whether Ward did, or was willing to, obtain substitutes for all shifts that he would miss. It appears that Allegheny would have to pay any such substitutes premium overtime pay, although the district court did not make any definitive finding of fact on this issue
 At trial, the district court permitted counsel for Ward to introduce evidence to the effect that one week prior to trial Ward offered to reimburse Allegheny for any expense that it might incur in paying overtime to substitutes. The district court asserted that such testimony would be used only in the calculation of damages. However, the district judge, in his opinion on liability, adverted to this fact in support of his decision, and Allegheny has objected to this in its brief.
 On remand, this evidence should not be admitted on the issue of liability, since Federal Rule of Evidence 408 makes compromise offers inadmissible and since the fact that Ward offered, just prior to trial, to pay overtime costs is not relevant to the issue whether Allegheny was subject to an undue burden in 1972 and 1973.
 
 
 [7]
 At some point prior to his suspension, Ward inquired about the possibility of applying for an apprenticeship in a craft whose work schedule would permit him to avoid conflicts with observance of his Sabbath. Ward was informed that there were no openings and he thus did not place his name on an apprenticeship waiting list. Subsequently, Ward did sign up on such a list and at the time the district court rendered its judgment, Ward was still on the waiting list
 
 
 [8]
 Both the International Union and Ward's local were named in the complaint
 
 
 [9]
 See Ward v. Allegheny Ludlum Steel Corp., 397 F.Supp. 375 (W.D.Pa.1975)
 
 
 [10]
 Judge Gourley specifically rejected Allegheny's contention that it had satisfied the mandates of Title VII by giving Ward a job as a janitor. He stated that Allegheny would have to place Ward in a position of comparable pay and responsibility in order to comply with the statute
 
 
 [11]
 The district court held that the possible need to pay premium wages to substitutes did not constitute an undue hardship
 
 
 [12]
 Ward cross-appealed, urging that the district court had erred in its award of attorneys' fees. Give our disposition of this case, we do not reach this issue
 
 
 [13]
 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976), vacating 516 F.2d 544 (6th Cir. 1975). The Supreme Court originally affirmed the judgment of the Sixth Circuit by an equally divided vote. 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976). It then granted a petition for rehearing and remanded the matter for reconsideration in light of Trans World Airlines Co. v. Hardison, --- U.S. ----, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)
 
 
 [14]
 --- U.S. ----, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), rev'g 527 F.2d 33 (8th Cir. 1975)
 
 
 [15]
 --- U.S. ----, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)
 
 
 [16]
 At the time relevant to the Hardison case, Title VII did not contain a definition comparable to 42 U.S.C. § 2000e(j). However, certain 1967 EEOC guidelines, 29 C.F.R. § 1604.1, 32 Fed.Reg. 10298 (1967) contained language almost identical with this new statutory section
 
 
 [17]
 375 F.Supp. 877 (W.D.Mo.1974)
 
 
 [18]
 527 F.2d 33 (8th Cir. 1975)
 
 
 [19]
 See id. at 37-42
 
 
 [20]
 See --- U.S. at ----, 97 S.Ct. 2264
 
 
 [21]
 Id. at ---- - ----, 97 S.Ct. 2264
 
 
 [22]
 Id. at ---- - ----, 97 S.Ct. 2264. The Court may have indicated that whether a proposed accommodation would create costs that are more than de minimus is a matter to be determined on the basis of the projected number of instances of accommodation that a company may have to undertake, rather than on the impact of the single case of the plaintiff before the Court. See id. at ---- n. 15, 97 S.Ct. 2264
 
 
 [23]
 Judge Gourley held that rescheduling other employees in order to accommodate Ward even though this might arguably cut across the seniority provisions of the collective bargaining agreement, and the possibility that these replacements might have to be paid premium overtime wages did not constitute an undue hardship. See 397 F.Supp. at 377. These rulings squarely conflict with the Hardison Court's interpretation of Title VII. See page 582 supra
 
 
 [24]
 We note that Justice Marshall, in his dissent in Hardison, estimated that the cost of overtime wages for replacements for Hardison would have been $150. See --- U.S. at ---- n. 6, 97 S.Ct. 2264 (Marshall, J. dissenting). The Hardison majority, however, may have required that courts must look beyond individual cost in assessing the undue hardship question. See note 22 supra
 
 
 [25]
 In light of our disposition, we do not address the arguments of the parties pertaining to the constitutionality of the accommodation provisions