Charles R. GAVIN, Plaintiff,

v.

PEOPLES NATURAL GAS COMPANY, Defendant.

Civ. A. No. 77–1424.

United States District Court,
W. D. Pennsylvania.

Jan. 23, 1979.

Michael Hahalyak, Pittsburgh, Pa., for plaintiff.

Ralph F. Scalera, Jacques M. Wood, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

This case is before us on the defendant's Motion to Dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and Motion for Summary Judgment pursuant to Rule 56.

### I.

#### Background

Plaintiff, Charles R. Gavin, a Jehovah's Witness, was employed as a "service operator" at the defendant Peoples Natural Gas Company in Monongahela, Pennsylvania, in 1974. One of his job assignments was raising and lowering the company's American flag, but he refused to do so because he asserted that this act was in conflict with his religious convictions. As a result, he was discharged by the company on May 19, 1974. On June 4, 1974, he filed religious discrimination charges with both the Equal Employment Opportunities Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging, respectively, violations of Title VII of the Civil Rights Act of 1964 and of § 5(a) of the Pennsylvania Human Relations Act.

The EEOC apparently investigated the charge but did not hold hearings or settlement discussions, simply issuing to the plaintiff a "right to sue" notice on November 21, 1977. The PHRC considered plaintiff's charge more thoroughly, conducting an administrative hearing after attempts at conciliation failed. Following the hearing, the PHRC on August 27, 1976, issued findings of fact and conclusions of law and entered an opinion and order dismissing the plaintiff's complaint. (Defendant's Exhib-

its in support of Motion for Summary Judgment, D, E, F, and I). The PHRC held that the testimony of an elder of the complainant's congregation established that the complainant's refusal was not required by religious creed, that the belief of plaintiff was therefore not protected under the Pennsylvania Act, and that the complaint would therefore be dismissed.

Plaintiff sought review of the PHRC's decision in the Commonwealth Court of Pennsylvania, but this appeal was dismissed by the court on February 14, 1977, due to his failure to file the record of his case within the time limit previously set by the court. (Defendant's Exhibits in Support of Motion for Summary Judgment, J and K).

In the meantime, and within the period of limitations, the plaintiff had filed this suit under Title VII, 42 U.S.C. § 2000e et seq. He alleged that the defendant discriminated against him because of "his religion, his conscientious convictions, as well as his race."

The defendant has responded with a Motion to Dismiss the race discrimination claim and a Motion for Summary Judgment on the religious discrimination claim. The Motion to Dismiss is on the grounds that race discrimination had not been asserted in plaintiff's claims before the EEOC. The Motion for Summary Judgment makes two contentions: that the state proceedings raise a bar of res judicata and that the religious discrimination section of Title VII at 42 U.S.C. § 2000e(j) is unconstitutional.

### II.

#### The Motion to Dismiss

As earlier noted, defendant's administrative claim before the EEOC involved only a charge of religious discrimination. That was the charge which the EEOC investigated and on which it issued its determination and invited the defendant to conciliate (Exhibit C to defendant's Motion to Dismiss). Specifically, the EEOC found that the defendant made no effort to reasonably accommodate the plaintiff's religious beliefs.

Filing of a charge with the EEOC is a well established jurisdictional prerequisite to suit under Title VII, 42 U.S.C. § 2000e–5(e). *Mickel v. South Carolina State Employment Service*, 377 F.2d 239 (4th Cir. 1967), *cert. denied*, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166 (1968). The purpose of this rule is to effectuate the Civil Rights Act's primary goal of voluntary compliance. Therefore, the federal courts may hear only those charges made before the Commission or those which would reasonably be expected to grow out of the original charge. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394 (3d Cir. 1976).

We agree with defendant that plaintiff's claim of racial discrimination, raised for the first time in his complaint in this court, is not the type of claim which would have naturally grown out of his original religious discrimination charge, and it must therefore be dismissed. In *EEOC v. Bailey Co.*, 563 F.2d 439 (6th Cir. 1977), the United States Court of Appeals for the Sixth Circuit declined jurisdiction over a religious discrimination claim in a complaint brought by the EEOC where the original charge had consisted of claims of racial and sexual discrimination. *See also EEOC v. United States Fidelity & Guaranty Co.*, 420 F.Supp. 244 (D.Md.1976) (EEOC cannot expand sex discrimination charge to race discrimination investigation).

Since the race discrimination claim was not made before the EEOC, this court is without jurisdiction to hear it now. The defendant's Motion to Dismiss that claim will therefore be granted.

### III.

### *Defendant's Motion for Summary Judgment*

Defendant's Motion for Summary Judgment presents two questions for resolution: (1) whether plaintiff's federal claim of religious discrimination should be barred by the doctrine of *res judicata* because of state adjudication of the same claim, and (2)

whether § 701(j) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(j), violates the Establishment Clause of the First Amendment to the United States Constitution.

### A. *RES JUDICATA*

■ In its brief and at oral argument, the defendant has asserted that the plaintiff should not now be permitted to use a federal forum to reargue facts in support of his religious discrimination claim that were heard in state administrative proceedings and could have been heard by the Commonwealth Court had he not failed to pursue his appeal. The employer here has apparently been called upon to defend itself in at least five previous forums,[1] and its frustration with this claim is understandable. However, for purposes of determining federal jurisdiction and whether plaintiff is entitled to pursue his claim here, we may consider only his earlier claims to the PHRC and the EEOC.

*Res judicata* is the judicially created doctrine that a final judgment on the merits by a court of competent jurisdiction is conclusive of the rights of the parties in any later suit brought on the same cause of action. *See, e. g., Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 395, 100 A.2d 595, 598 (1953).

The doctrine has been applied by the federal courts in some civil rights actions, barring the federal suit because of an earlier state adjudication on the same issues. In *Whitner v. Davis*, 410 F.2d 24 (9th Cir. 1969), and in *Frazier v. East Baton Rouge Parish School Board*, 363 F.2d 861 (5th Cir. 1966), two courts of appeal have expressed the opinion that state court adjudications of teacher dismissals would normally be *res judicata* in subsequent suits for violation of constitutional rights under 42 U.S.C. § 1983.

Both of the parties herein cite *Mitchell v. National Broadcasting Company*, 553 F.2d 265 (2d Cir. 1977), in support of their differing positions. In *Mitchell*, the Second Circuit held that a federal civil rights action

---

1. Plaintiff took his claim through union grievance proceedings, to the NLRB, and to the Unemployment Compensation Board, as well as to the PHRC and EEOC.

under 42 U.S.C. § 1981 (the civil rights statute forbidding racial discrimination in making and enforcing contracts) was barred by a final decision by the State Division of Human Rights, affirmed by a state appellate court, rejecting the plaintiff's claim.

After warning that "[T]he implications of barring a civil rights claim on *res judicata* grounds deserve careful consideration," 553 F.2d at 269, the Second Circuit went on to hold that *res judicata* was justified in *Mitchell* for these reasons:

(1) the issues were sufficiently similar because the protection against discrimination afforded by the state statute was "at least as broad as that afforded by the federal constitution and civil rights statutes," 553 F.2d at 269–70;

(2) the issue at the state level was fully and fairly litigated on its merits, 553 F.2d at 270–73;

(3) the decision of the state appellate court affirming the state agency was entitled to full faith and credit under 28 U.S.C. § 1738, 553 F.2d at 274; and

(4) there were no countervailing policy considerations, *similar to those underlying Title VII*, that would suggest that state and federal remedies remain parallel and independent, 553 F.2d at 274–76.

There are obvious differences between the *Mitchell* case and the instant suit. We cannot say that the religious discrimination provisions of the Pennsylvania act are as broad as those of Title VII since the Pennsylvania act does not include a "reasonable accommodation" section as does the Federal Act, nor was the dismissal of the instant plaintiff's appeal a final judgment on the merits similar to the *Mitchell* appellate affirmance. However, the fourth point considered in *Mitchell*—underlying policies— compels us to make a distinction between Title VII and the other civil rights statutes as several courts have already done. The legislative history of Title VII "manifests [an] intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Alexander v. Gardner-Denver*

*Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974).

The Second Circuit, holding that a "settlement" between an employee and an employer in state proceedings did not bar a subsequent federal suit, noted:

"The 'harsh' and 'technical' procedural rule of election of remedies . . . is not applicable to Title VII Civil Rights, because the purposes underlying enactment of that Title were clearly based on congressional recognition that '. . . state and local [civil rights] laws vary widely in effectiveness.'" (citation omitted) 452 F.2d at 894.

*Voutsis v. Union Carbide*, 452 F.2d 889 (2d Cir. 1971). (quoting statement of Senator Joseph Clark).

*See also Batiste v. Furnco Constr. Co.*, 503 F.2d 447 (7th Cir. 1973) ("policies embodied in Title VII require that *res judicata* not be applied to state adjudications"); *Int'l Brotherhood of Electrical Workers, Local 5 v. EEOC*, 398 F.2d 248, 250 n.3 (3d Cir. 1968) (investigation by state commission that did not substantiate charge did not bar complaint before EEOC).

Further, a 1972 amendment to Title VII established what effect a state agency ruling should have on a subsequent EEOC proceeding. 42 U.S.C. § 2000e–5(b) now provides:

"In determining whether reasonable cause exists the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the provisions of (c) and (d) [mandating deferral]"

It is clear that Congress, while encouraging comity, did not intend that the EEOC be *bound* by prior state determinations. It seems unlikely that Congress would plan a scheme wherein the EEOC could process a claim which the state had dismissed but that the federal court would be barred by the state's action.

Although civil rights claims may sometimes be barred by *res judicata* where there has been a state adjudication, and although the facts of this case might arguably sup-

port such a finding in the interests of judicial economy and finality, the unusual statutory scheme of Title VII and the weight of authority thereunder compel us to deny the defendant's Motion for Summary Judgment on the grounds of *res judicata.*

## B. *THE CONSTITUTIONAL QUESTION*

■ Because we find the plaintiff's claim is not barred by *res judicata,* we must reach the defendant's claim that § 701(j) of the Act, 42 U.S.C. § 2000e(j), is unconstitutional. The First Amendment to the Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Simply put, Congress may neither endorse nor impede the religious beliefs of Americans. The Supreme Court of the United States "repeatedly has recognized that tension inevitably exists between the Free Exercise and the Establishment Clauses" and that to maintain the balance between the two, government must remain neutral in matters of religion. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973).

The defendant here contends that the Congress has broken that tension and abandoned its neutrality by enacting the 1972 amendment to Title VII, 42 U.S.C. § 2000e(j), which extends the meaning of "religion" under the Act and defines more specifically the employer's responsibility not to discriminate on the basis of religion:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

This section is implemented by EEOC guidelines, which place an affirmative duty on employers to make reasonable accommodations to the religious needs of employees, 29 C.F.R. § 1605, 32 Fed.Reg. 10298.

The plaintiff argues that by failing to exempt him from raising and lowering the flag as part of his job duties, the defendant has violated the "reasonable accommodation" requirement of Title VII. The defendant responds that if this is so, the "reasonable accommodation" requirement is unconstitutional. The question for decision, then, is whether the reasonable accommodation provision of Title VII, 42 U.S.C. § 2000e(j), is unconstitutional as applied to the facts of this case.

This is the kind of fact situation and legislative act that a professor of constitutional law might well have composed for a final examination question: it requires us to review analogous precedent under the First Amendment, to examine the purpose and effect of the Act, to distinguish this fact situation from other cases, and to recall the most basic principles of our constitutional democracy.

The Supreme Court has delineated certain practices which are clearly prohibited by the Establishment Clause of the Constitution:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect, 'a wall of separation between Church and State.'" *Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1946).

In the years since the *Everson* case, the courts have dealt with less clear questions of constitutionality under the Establishment Clause. Mandatory bible reading in the public schools has been declared to be a constitutional violation. *School District of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). A state program providing for maintenance and repair grants to church-related schools was struck down because it had "a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools," *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 2966, 37 L.Ed.2d 948 (1973); likewise, public payment of salaries of teachers in sectarian schools has been found unconstitutional, *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and state programs providing for tuition reimbursement or tax credits to parents of children in sectarian schools have been invalidated, *Nyquist, supra; Sloan v. Lemon*, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), *reh. denied*, 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (1974). The provision by public school systems of certain auxiliary services, such as remedial instruction, counseling and testing, to sectarian schools, was held unconstitutional where the primary effect was the advancement of religious schools and entanglement of the state with religions would inevitably result, *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), *reh. denied*, 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702 (1976); but providing bus transportation and free loan of textbooks have been upheld, *Everson, supra; Meek v. Pittenger, supra; Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

A federal district court has held it constitutional to require that the pledge of allegiance, including its phrase "under God," be recited by public school children, *Smith v. Denny*, 280 F.Supp. 651 (N.D.Cal.1968), *appeal dismissed*, 417 F.2d 614 (9th Cir. 1968), and a circuit court has upheld the official use of the motto, "In God We Trust," *Aronow v. United States*, 432 F.2d 242 (9th Cir. 1976); however, regulations of the government's service academies mandating attendance at regular church services was found violative of the Establishment Clause, *Anderson v. Laird*, 151 U.S.App.D.C. 112, 466 F.2d 283 (1972), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 690, 34 L.Ed.2d 665 (1973).

A careful review of these cases arising under the Establishment Clause would demonstrate that the question of encouraging religion is often one of balancing legitimate state interests against prohibited results or one of the degree of involvement between church and state. The Supreme Court has established three tests of the constitutionality of statutes challenged under the Establishment Clause. In *Meek v. Pittenger*, 421 U.S. 349, 358–59, 95 S.Ct. 1753, 1759–60, 44 L.Ed.2d 217, the Court instructed:

> "In judging the constitutionality of the various forms of assistance . . . the District Court applied the three-part test that had been clearly stated, if not easily applied, by this Court in recent Establishment Clause cases. First, the statute must have a secular legislative purpose. Second, it must have a 'primary effect' that neither advances nor inhibits religion. Third, the statute and its administration must avoid excessive government entanglement with religion.
>
> These tests constitute a convenient, accurate distillation of this Court's efforts over the past decades to evaluate a wide range of governmental action challenged as violative of the constitutional prohibition against laws 'respecting an establishment of religion,' and thus provide the proper framework of analysis for the issues presented in the case before us. It is well to emphasize, however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." (Citations omitted.)

If a statutory provision fails any of these three tests, it is likely to be violative of the Establishment Clause.

The defendant argues that the legislative enactment challenged here fails all three; it contends that the purpose of the amendment was to advance certain specific religions, that the effect of the amendment is generally to promote religion, and that the amendment fosters the entanglement of the government in religious activity.

There is some indication in the legislative history that the floor amendment which became § 701(j) was originally motivated by sectarian impulses. Remarks on the floor of the Senate by Senator Jennings Randolph include these revealing statements:

"I am sure that my colleagues are well aware that there are several religious bodies—we could call them religious sects; denominational in nature—not large in membership but with certain strong convictions, that believe there should be a steadfast observance of the sabbath and require that the observance of the day of worship, the day of The Sabbath, be other than on Sunday . . There are approximately 750,000 men and women who are Orthodox Jews in the U. S. work force who fall in this category of persons I am discussing. There are an additional 425,000 men and women in the work force who are Seventh Day Adventists.

.   .   .   .   .

".   . [t]here has been a partial refusal at times on the part of employers to hire or continue in employment employees whose religious practices rigidly require them to abstain from work in the nature of hire on particular days. So there has been, because of understandable pressures, such as commitments of a family nature, and otherwise, a dwindling of the membership of some of the religious organizations because of the situation to which I have just directed attention.

.   .   .   .   .

".   . My own pastor in this area, Rev. Delmar Van Horne, has expressed his concern and distress that there are certain faiths that are having a very difficult time, especially with the younger people and understandably so, with reference to a possible inability of employers on some occasions to adjust work schedules to fit the requirements of the faith of some of their workers."

118 Cong.Rec. 705 (1972).

Other legislative intent is difficult to discern, with barely a reference made to the "reasonable accommodation" provision in the Conference Committee Report, H.R. Reg. No. 92–899, 92d Cong., 2d Sess. 15 (1972); S.Rep. No. 92–681, 92d Cong., 2d Sess. 15 (1972), or on the floor of the House of Representatives prior to a vote on the amendment, 118 Cong.Rec. 7569 (1972).

If the quoted remarks were the sole reason for passage of the "reasonable accommodation" provision, we might agree with the defendant that such passage "abandon[ed] secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents or any sect or religious organization" in violation of the Establishment Clause. *Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971). However, it is arguable that a secular purpose may be inferred from the amendment in light of the larger purposes of Title VII. We noted earlier the continuous tension between the Establishment Clause and the Free Exercise Clause of the First Amendment. The purpose of the religious accommodation amendment may have been to be sure that the Free Exercise Clause had meaning to those workers whose religious beliefs fell outside the norms around which the daily schedules of most businesses were arranged. The Court of Appeals for the Sixth Circuit, in a majority opinion upholding the constitutionality of the "reasonable accommodation" provision wrote:

"The reasonable accommodation rule, like Title VII as a whole, was intended to prevent discrimination in employment. Specifically, the rule was designed to put teeth in the existing prohibition of religious discrimination."

*Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), *affirmed per curiam by an*

*equally divided court,* 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976), *reh. granted,* 433 U.S. 903, 97 S.Ct. 2965, 53 L.Ed.2d 1087 (1976), *vacated,* 561 F.2d 658 (6th Cir. 1977). (The second circuit court opinion dismissed the complaint on other grounds.)

A dissent to the *Cummins* majority strongly disagreed. One district court which has found the "reasonable accommodation" provision clearly unconstitutional rested primarily on the act's purpose to impose on employers a duty to discriminate on the basis of religion. *Yott v. North American Rockwell,* 428 F.Supp. 763 (C.D.Cal.1977). We recognize that there are valid arguments to be made on both sides of the test of "secular purpose" with this amendment.

Likewise, whether the effect of the amendment is primarily to advance religion is an unsettled question. We also note that in recent Supreme Court cases this second test—secular primary effect—has itself been debated among the justices.[2] In *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court was divided on the proper application of this test, with Chief Justice Burger arguing, in a dissenting opinion, that "government aid to individuals generally stands on a different footing from direct aid to religious institutions." *Id.* at 801, 93 S.Ct. at 2990. The defendant argues that the sole results of the amendment are to aid and advance certain religions, specifically those which observe a Sabbath other than Sunday, and to promote religion generally as against non-believers. Defendant's position is supported by Circuit Judge Celebrezze's dissent in *Cummins, supra,* where he reflected:

> "Only those [religions] which require their followers to manifest their belief in acts requiring modification of an employer's work rules benefit, while others are inconvenienced by the accommodation. By singling out particular sects for government protection, the Federal Government has forfeited the pretense

that the rule is merely part of the general ban on religious discrimination." 516 F.2d at 558.

The reported cases we have found which have been litigated under the "reasonable accommodation" provision have most frequently involved requests by employees for specific scheduling in order to observe a Sabbath other than Sunday. *E. g., Chrysler v. Mann,* 561 F.2d 1282 (8th Cir. 1977) (company did not discriminate against member of World Wide Church of God who took unpaid leaves of absence to observe Friday-Saturday Sabbath); *United States v. City of Albuquerque,* 545 F.2d 110 (10th Cir. 1976) (it would create undue hardship to accommodate city fireman who was Seventh Day Adventist and who refused to work Saturday shift); *Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515 (6th Cir. 1976) (member of World Wide Church of God discharged for refusing to work Saturdays; held, employer must accommodate this employee's religious practice even though other workers would be inconvenienced in covering for him); *Reid v. Memphis Publishing Company,* 369 F.Supp. 684 (W.D.Tenn.1973), aff'd 521 F.2d 512 (6th Cir. 1974), *reh. denied* 525 F.2d 986 (6th Cir. 1975), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976) (copy reader who was Seventh Day Adventist and was denied employment because of refusal to work Saturdays awarded damages); *Johnson v. U. S. Postal Service,* 364 F.Supp. 37 (N.D.Fla.1973) (postal clerk who was member of World Wide Church of God entitled to reasonable accommodation of religious schedule).

It is clear from reviewing the cases that individuals of certain religious beliefs have been benefitting under the 1972 amendment. Parenthetically, we would note that this may be because members of certain sects are more knowledgeable of the law, or for any number of reasons. Eventually, the protection of the act may spread to many others. However, it can only spread to

---

**2.** *See also* the two opinions in *Public Funds for Public Schools of New Jersey v. Byrne,* 590 F.2d 514 (3d Cir. 1979).

individuals who characterize their beliefs or convictions as "religious." If one were an avid sports fan, one could not use that enthusiasm, however intense, to require an accommodation to one's desire to attend a sports event. Many philosophies overlap with religious beliefs: vegetarianism, conscientious objection, pantheism, for example. *Quare:* at what point does a philosophy, a conviction, or a feeling become a religious belief entitled to a "reasonable accommodation?"

Having acknowledged that certain individuals benefit from the amendment, we must next question whether the benefit is to religion and whether such benefit is an "incidental" one or the "primary effect" of the enactment. If there is some benefit to religion, the amendment may still be justified if there is a secular effect outweighing the incidental benefit. *Everson, supra; Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

The plaintiff has argued that the primary effect of the amendment, like its purpose, is inhibiting discrimination. It might also be argued that the benefits of the act run to individuals rather than to religion directly, *Nyquist, supra* (Burger, J., dissenting), and that the amendment should therefore be subjected to a lesser standard of review. The defendant has argued that the primary effects of the amendment have been to require employers to favor certain employees on the basis of religion and to exempt certain workers from lawful obligations, even those arising under union contracts. The Seventh Circuit reviewed this issue recently in a case contesting National Labor Relations Board jurisdiction over parochial school workers. *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112 (7th Cir. 1977). After discussing the *Cummins* and *Yott* cases, which we have cited earlier, the court concluded:

"This synopsis of recent litigation in the religion area persuades us that at the very least there is a substantial constitutional question presented where what is involved is an 'accommodation' or, synonymously, an adjustment or an adaption or

a compromise in a settlement involving a First Amendment right."
559 F.2d at 1129.

Although this case did not directly involve the "religious accommodation" amendment, the court's recognition of the "substantial constitutional question" aids the defendant's claims.

We believe that the defendant has raised serious constitutional challenges to the validity of this amendment under the "purpose" and "effect" tests outlined by the Supreme Court. However, we believe that these questions could better be resolved by an appellate court on an appropriate record, perhaps on a fuller record than that before us now.

However, the last test, or "helpful signpost," of unconstitutionality directly affects any consideration of this case. This third test is that "the statute and its administration must avoid excessive government entanglement with religion." *Meek v. Pittenger*, 421 U.S. 349, 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975). "The test is inescapably one of degree." *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970).

The separation of church and state in our society has long required that government take a "hands off" approach to internal church disputes and matters of religious doctrine. *Watson v. Jones*, 13 Wall. 679, 20 L.Ed. 666 (1872); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

In a 1969 case, the Supreme Court considered how the First Amendment circumscribed the power of civil courts in church matters:

"First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern

. . . ." *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969).

We noted earlier the difficulty in determining what makes a belief or feeling qualify as a religious one. Defining race or sex under Title VII seem to have raised no particular difficulty in litigation under those categories; in fact, these particular classifications, because they are "immutable characteristic[s] determined by the accident of birth" and "traits for which [individuals] bear no responsibility" have been held to be entitled to particular protection under The Civil Rights Act of 1871, 42 U.S.C. 1985(3), *Novotny v. Great American Federal Savings*, 584 F.2d 1235, 1243 (3d Cir. 1978), and to strict scrutiny where discrimination against such class is alleged on constitutional grounds, *Frontiero v. Richardson*, 411 U.S. 677, 684–87, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

In most instances, race and sex are easily determinable characteristics. Religion, on the other hand, is not so easily defined or determined. Before the protection of the act under discussion can be invoked, an individual must assert a religious belief, and where an employer objects on the basis of the *bona fides* of such assertion, someone— whether an agency entrusted with enforcement of the act or a federal court judge— must determine whether a *bona fide* religious belief was the basis of discrimination.

In the cases brought under this act which we have referred to earlier, the religious practice which occasioned the original conflict was most often the observance of a Sabbath other than Sunday. This is not an uncommon religious practice and apparently the issue we face here was not raised in those cases. The plaintiff here asserts that since his religion views flags as false idols, his employer was required to accommodate to his refusal to raise and lower the American flag. In the proceedings on this claim before the Pennsylvania Human Relations Commission, an elder of the plaintiff's congregation testified as an expert on the be-liefs which were held by members of their religion. The Pennsylvania Commission then found itself in the awkward—and, we believe, constitutionally prohibited—position of determining what belief the plaintiff could assert as a *bona fide* religious belief. The Opinion issued by the Commission explained:

> "It is important to note that the complainant specifically invokes the protection of the Pennsylvania Human Relations Act as a member of the 'Jehovah's Witness religious organization.' Accordingly, the deposition of Mr. John DeGregorio, an elder of the complainant's congregation, is entitled to great weight. Mr. DeGregorio's testimony as well as the Stipulation of Facts, compel the Commission's conclusion that the complainant's conviction is not part of the Jehovah's Witness religious creed since the complainant was never requested to participate in any flag ceremony, but merely to perform the job duty of raising and lowering the flag."

The implication of this conclusion is that under an act prohibiting religious discrimination in employment, only religious beliefs which are part of a recognized creed are protected. But what if two experts were called and they disagreed on what beliefs were acceptable in a given sect? What if there were majority and minority views of what beliefs were acceptable? These are not merely academic questions, because we have before us a complainant who asserts a religious belief which has been questioned by his employer and which has, in a prior proceeding, been adjudicated not to be a valid religious belief. At a minimum, were this case to be tried, we would have to determine whether the belief asserted is to be characterized as a "religious" belief, and whether such a belief, which may be outside the standardized creed of his faith, is protected under the Act. We might well then have to reach the hypothetical questions posed above.

In his dissent in *Cummins*, Judge Celebrezze foresaw the difficulty we now face:

"Disposition of Complaints under the amendment will require inquiry into the sincerity with which beliefs are held and force consideration of the validity of the religious nature of claims, procedures which are not favored and may themselves be improper because they put courts in review of religious matters." 516 F.2d at 559.

It might be argued that administrative agencies and courts have had to make similar determinations in cases involving conscientious objectors. The Ninth Circuit has distinguished the conscientious objector cases from religious accommodation cases, stating, "[n]or can we hold as suggested by appellant, that conscientious objector military service cases are similar. No law of the land requires plaintiff to work only at [this plant]." *Yott v. North American Rockwell*, 501 F.2d 398, 400 (9th Cir. 1974) (predating the district court decision on remand finding the provision unconstitutional). For purposes of testing entanglement, another distinction can be drawn. Deciding whether an individual qualifies for an exemption from military service on conscientious objection grounds involves a narrow determination that one holds a specific belief precluding effective military service. Making such a narrow determination, although difficult, is quite different from determining whether a particular or unusual belief is "religious" and entitled to protection under a statute protecting "religion." Conscientious objector cases generally examine the good faith of an individual asserting a belief and not the merits of the belief itself.

We hasten to add that we accord all due respect to the plaintiff and to whatever beliefs he holds, religious or otherwise. And it is just because we respect his beliefs and are entrusted with the constitutional responsibility of protecting the free exercise of those beliefs that we fear becoming involved in an adjudication of whether those beliefs are legitimate, or whether they are "religious." We shudder at (and believe the First Amendment would be shaken by) a courtroom scene wherein experts would be cross-examined as to the legitimacy of a specific religious conviction.

Because proceeding to trial on the facts of this case would necessarily lead to an entanglement of this court with religious beliefs, requiring us to abandon the constitutionally-mandated "hands off" attitude in matters of religion and conscience, we find that this amendment cannot constitutionally be applied to the case before us.

Two other possible avenues of reasoning lead to the same conclusion on the constitutionality of the amendment before us. First, we might define "religion" or religious "belief" to include anything which an individual decides is religious in his own scheme of things. Then, we might avoid the entanglement problem. However, it could hardly have been the intent of Congress to require accommodation to such an undefined element, and such a reading could create havoc in the workplace. Further, such a reading would create due process problems for employers who would have no way of implementing such a broad and vague scheme wherein they were charged with an affirmative duty to accommodate.

Second, we might determine—without taking testimony as the state agency did—that plaintiff's belief was not religious as a matter of law since it fell outside the protection intended by the Act. This would require us to read the Act as protecting only certain established religions, and such a reading raises its own immediate constitutional questions: Could Congress, consistent with the Establishment Clause, pass a law protecting some religions and excluding others? How would an employer or employee know what was protected?

This opinion—read in conjunction with other cases—might lead to the result that only those with easily recognizable, or common, religious beliefs would be protected, and the amendment found to be unconstitutional on its face on that basis. Since we have such difficulty defining religion in a legal context, we realize how difficult it must be for employers to understand their responsibilities under the "religious accommodation" provision and how valid due

process denials or "vagueness" arguments could be asserted.

These "due process" and "establishment" problems are like the blanket which, when pulled up over the head, uncovers the feet. Any legislative definition would make the limits of protection of the act more clear and ease our due process concerns; however, since all definitions are inclusive and exclusive by nature, any legislative or judicial definition of religion invites a First Amendment problem.

These larger questions are more appropriate concerns for appellate courts, and we would invite their review.

We note that the Third Circuit has expressly left open the question of constitutionality of the reasonable accommodation provision. *Ward v. Allegheny Ludlum Steel Corp.*, 560 F.2d 579 (3d Cir. 1977). Reviewing a case in which Judge Gourley of our own district had upheld the constitutionality of the amendment without discussion, and remanding for further proceedings on a different issue, the Court noted:

> "In light of our disposition, we do not address the arguments of the parties pertaining to the constitutionality of the accommodation provisions."

560 F.2d at 583, n.25.

Whatever the ultimate disposition of these larger issues, we are certain we cannot proceed with the case before us without violating either the prohibitions of the Establishment Clause or the due process rights of the defendant. Since no facts are disputed, and since the religious discrimination claim is the only claim of plaintiff over which we have jurisdiction, summary judgment will be entered for the defendant.