AMERICAN MOTORS CORPORATION, Petitioner-Appellant, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Respondent.†

Court of Appeals

*No. 77–703.  Argued October 25, 1978.—*
*Decided November 2, 1979.*
(Also reported in 286 N.W.2d 847.)

† Petition to review granted.

For the petitioner-appellant there was a brief by *Herbert P. Wiedemann, Michael I. Paulson* and *Foley & Lardner* of Milwaukee and oral argument by *Michael I. Paulson.*

For the respondent there was a brief by *Bronson C. La Follette,* attorney general and *David C. Rice,* assistant attorney general, and oral argument by *David C. Rice,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J.   This is an appeal from a judgment of the circuit court for Dane County affirming the findings of the Department of Industry, Labor and Human Relations (department) that the American Motors Corporation (AMC) had violated the Wisconsin Fair Employment Act (WFEA) by discharging one Thomas L. Bartell from its employ.  The case presents an issue never before considered by an appellate court in Wisconsin, namely whether the Act requires Wisconsin employers to accommodate the religious needs of their employees.

AMC hired Bartell, who is an engineer, for a management position at its Milwaukee plant in 1972.  He and two other new employees were required to participate in a six-month training program beginning on July 7, 1972. As a part of that program, each of the three was assigned separately, on a rotating basis, to various departments within the plant to learn their operations.  A personnel manager who coordinated the training program testified that it was somewhat disruptive for each of the departments involved, and that therefore the schedule was rigidly planned to avoid having more than one trainee in any department at the same time.

At an orientation meeting prior to the start of the training program, the personnel manager explained the program and distributed the schedule of assignments to the three trainees.  He also explained various company policies, including those regarding holidays, vacations and leaves of absence.  Though the trainees were encouraged to ask questions, Bartell did not at that time volun-

teer that there would be a conflict between the schedule and any of his religious practices.

Bartell had been baptized as a member of the Worldwide Church of God on January 8, 1972, having studied its precepts and counseled with its ministers since 1968. This church, which was founded in 1934, observes the weekly Sabbath from sundown Friday to sundown Saturday. During that time, and during certain other holy days each year, members are forbidden to engage in secular work. In 1972 one such holy day, the Day of Atonement, fell on Monday, September 18. The eight-day Feast of Tabernacles commenced on September 22 and ended Friday, September 29. Church members were required to refrain from secular work on the first and last day of the Feast of Tabernacles and to attend a regional convention in Wisconsin Dells during the intervening week.

On August 7, 1972 Bartell asked the personnel manager if he could be excused from work on September 18, 22 and 25 through 29 so that he could attend "a religious convention." At that time he did not explain that his attendance was considered mandatory by his church. After conferring with company officials, the personnel manager told Bartell on August 10, 1972 that his request was denied. Bartell then explained that his attendance was compulsory. The personnel manager had further discussions with his superiors, and on August 17 told Bartell that he would have to work the days in question or be terminated. He suggested that Bartell think the matter over and communicate his decision on the following day. On August 18 Bartell told the personnel manager that he could not change his request for the days off. He was told in return that he was terminated from employment effective that date.

On August 24, 1972 Bartell filed a complaint with the federal Equal Employment Opportunity Commission

(EEOC), alleging that the termination was based upon religious discrimination. The complaint was referred to the department, which found probable cause to believe that a violation of the Wisconsin Fair Employment Act had occurred. Conciliation efforts were unsuccessful. The complaint was certified to hearing on July 9, 1973.

The department issued its final decision and order on January 13, 1977, determining that AMC had violated the Act in discharging Bartell. AMC was ordered to cease and desist from discriminating against him and to pay backpay from August 19, 1972 through February 4, 1973, when Bartell found other employment. AMC appeals from a circuit court judgment entered May 2, 1978 affirming the findings and order of the department but modifying the order to exclude back pay. The department appeals from that part of the judgment excluding back pay.

The issues on appeal are:

1. Whether AMC had a duty to accommodate Bartell's religious needs under WFEA.

2. If so, whether that requirement of the Act is in violation of the establishment clause of the first amendment to the United States Constitution or of article I, section 18 of the Wisconsin Constitution.

3. Whether the evidence is sufficient to support the department's findings that AMC failed to afford a reasonable accommodation to Bartell.

4. Whether the department had authority to award back pay to Bartell.

## I. *Duty To Accommodate*

The Wisconsin Fair Employment Act is set forth in secs. 111.31 through 111.37, Stats. The Act prohibits discrimination in employment based upon a variety of factors which the legislature has determined are irrele-

vant to an individual employee's qualifications for work. The declaration of policy set forth in sec. 111.31 states that employment discrimination based on such factors will adversely affect the general welfare of the state and of individuals by fomenting "domestic strife and unrest," by depriving the state of "the fullest utilization of its capacities for production," and by depriving the victims of such discrimination "of the earnings which are necessary to maintain a just and decent standard of living."[1] Section 111.31(3) dictates that the Act shall

---

[1] Section 111.31(1) provides in full:.

(1) The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers, licensing agencies and labor unions of employment opportunities to such persons solely because of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, thereby committing grave injury to them.

(2) It is believed by many students of the problem that protection by law of the rights of all people to obtain gainful employment, and other privileges free from discrimination because of age, race, creed, color, handicap, sex, national origin or ancestry, would remove certain recognized sources of strife and unrest, and encourage the full utilization of the productive resources of the state to the benefit of the state, the family and to all the people of the state.

(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose.

be liberally construed to accomplish the purpose of the Act to "encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of" the prohibited factors.

When the original Act was enacted in 1945,[2] the disapproved factors for discrimination in employment were five: race, creed, color, national origin and ancestry. These factors were not then, and are not now, separately defined by statute. "Creed" has been defined by the Wisconsin Supreme Court to be synonymous with religion in *Augustine v. Anti-Defamation League B'nai B'rith*, 75 Wis.2d 207, 214–15, 249 N.W.2d 547, 550–51 (1977). Section 111.32(5)(a), Stats., presently provides:

"Discrimination" means discrimination because of age, race, color, handicap, sex, creed, national origin or ancestry, arrest record or conviction records by an employer . . . against any employe or any applicant for employment . . . in regard to hire, tenure or term, condition or privilege of employment or licensing. . . .

Amendments to the Act after 1945 added sex, handicap, and arrest and conviction records as prohibited factors of discrimination in employment. With each of these additions, the legislature enacted separate definitional subsections detailing the kinds of employment decisions which were, and were not, considered to be discriminatory and prohibited under the Act. Under

---

[2] Section 111.32(5), ch. 490, Laws of 1945, defined discrimination:

The term "discrimination" means discrimination because of race, color, creed, national origin, or ancestry, by an employer individually or in concert with others against any employe or any applicant for employment in regard to his hire, tenure or term, condition or privilege of employment, and by any labor organization against any member or applicant for membership, and also includes discrimination on any of said grounds in the fields of housing, recreation, education, health and social welfare.

these definitions, employment decisions based upon (or taking into consideration) the enumerated factors are not prohibited if such factors have a reasonable relationship to the specific requirements of the job or employment decision in question.[3]

At no time, however, has the legislature acted to define discrimination based upon the original five factors, including creed. Consequently, the legislature's intention to require, or not to require, that employers make reasonable accommodations for the religious needs of their employees is not clear from the Act.

Other courts, faced with the same problem of legislative silence in this area, have reached conflicting results in interpreting similar statutes. Title VII of the Federal Civil Rights Act of 1964 which prohibits discrimination in employment on the basis of race, color, sex, religion or national origin is similar to the WFEA. 42 U.S.C. sec. 2000e–2(a)(1). Congress amended the Act in 1972 to impose an express duty on employers "to reasonably accommodate to an employee's or prospective employee's religious observance or practice."[4] Prior to that time the validity of EEOC regulations to that effect were in doubt under conflicting decisions of federal circuit courts of appeals. In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 76 n. 11 (1977), however, the United States Supreme Court accepted the EEOC interpretation of the federal Act as "a defensible construction of the pre-1972 statute," in part because Congress had ratified that construction in the amendment. The court's conclusion was consistent with its holding in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), which construed the Civil Rights

---

[3] *See, e.g.*, sec. 111.32(5)(f)1 which states that discrimination on the basis of handicap is prohibited ". . . unless such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment, membership or licensure."

[4] 42 U.S.C. sec. 2000e(j) (1979).

Act to prohibit employment practices which were facially neutral, but which had a discriminatory effect, even where the employer had no intention or motive to discriminate. The court stated in *Griggs:*

The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. 401 U.S. at 431.

The supreme courts of several states have construed their own anti-discrimination laws, in conformity with federal law, to impose a reasonable accommodation requirement. In *Rankins v. Commission on Prof. Comp. of Ducor,* 154 Cal. Rptr. 907, 593 P.2d 852, (1979), the California Supreme Court found such a requirement to be implicit in the state's constitutional prohibition against religious discrimination, and held that a school district had violated the same by discharging a teacher who belonged to the Worldwide Church of God for being absent from school during the holy days here in question. In *Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860 (Ala. 1978), the Alaska Supreme Court reached a similar construction of a fair employment statute modeled after the Federal Civil Rights Act on the basis of *Trans World Airlines v. Hardison,* 432 U.S. 63 (1977), despite the fact that the Alaska legislature had not amended the act to require accommodation. The Maine Supreme Court came to an identical conclusion on the basis of *TWA supra,* and *Griggs, supra,* in *Maine Human Rights Commission v. Local 1361, United, Etc.,* 383 A.2d 369 (Me. 1978).[5]

---

[5] *See also Kentucky Commission on Human Rights v. Department,* 564 S.W.2d 38 (Ky. App. 1978), where the Kentucky Court of Appeals upheld a reasonable accommodation regulation similar to the EEOC guideline.

Other courts have reached opposing conclusions, but their holdings are subject to doubt. The Illinois Court of Appeals affirmed a trial court's holding that the Illinois Fair Employment Practices Act could not be construed as imposing an affirmative duty to accommodate religious beliefs in *Olin Corp. v. Fair Employment Practices Comm'n of Illinois,* 34 Ill. App.3d 868, 341 N.E.2d 459 (1976). The Illinois Supreme Court affirmed, 67 Ill.2d 446, 367 N.E.2d 1267 (1977), for the reason that accommodation under the facts of that case would have imposed an undue hardship on the employer. The court expressly refused to decide whether the statute required reasonable accommodation. 67 Ill.2d 4461, 367 N.E.2d 1264, 1271.

The Connecticut Supreme Court refused to imply a duty to accommodate from that state's fair employment statute in *Corey v. Avco-Lycoming Division, Avco Corp.,* 163 Conn. 309, 307 A.2d 155 (1972), *cert. den.* 409 U.S. 1116 (1973), but its opinion was released only a few days after *Trans World Airlines* was decided and did not consider that case. Moreover, the court relied on the holding of *Dewey v. Reynolds Metals Co.,* 429 F.2d 324 (6th Cir. 1970), *aff'd by an equally divided court,* 402 U.S. 689 (1971). The opinion in *Dewey* prompted the 1972 congressional amendment to the Civil Rights Act. The impact of the Supreme Court's divided affirmance was termed "inconclusive" in the *Trans World Airlines* case.[6]

We find the reasoning of the federal authorities and of those states which have imposed a duty of reasonable accommodation to be more persuasive than the opposing authority. The department has interpreted WFEA as

[6] 432 U.S. 63, 73, note 8.

imposing such a duty.[7] This interpretation is entitled to considerable weight since it is the agency charged with enforcing it. *Robinson v. Kunach,* 76 Wis.2d 436, 251 N.W.2d 449 (1977), *Milwaukee v. WERC,* 43 Wis.2d 596, 168 N.W.2d 809 (1969). While the department's interpretation has not been made in the form of a rule similar to the EEOC guidelines, it has been consistently applied and has been upheld by at least one other reviewing court, which found the accommodation requirement "neither without reason nor inconsistent with the purposes of the Act."[8] Though it may be doubted that this administrative construction is sufficiently longstanding to raise a presumption of legislative acquiescence, *see Layton School of Arts and Design v. WERC,* 82 Wis.2d 324, 262 N.W.2d 218 (1978), we conclude that the legislature's failure to adopt an express amendment ratifying the same does not raise the contrary inference that it intended to disapprove that construction. This is not a case in which the legislature has expressly considered and rejected such an amendment, thus evincing an intent that no accommodation should be required. *See Ross v. Ebert,* 275 Wis. 523, 82 N.W.2d 315 (1957).

Further, the Wisconsin Supreme Court has stressed in other discrimination cases the express legislative intent set forth in sec. 111.31, Stats., that the Act must be

---

[7] *Carnahan v. Liberty Trucking Co.,* DILHR Examiner, Recommended Conclusions of Law, (Sept. 6, 1974), at 5, *adopted by the Commission,* DILHR Decision and Order (March, 1975); *Rau v. International Ass'n of Machinists Lodge 34,* DILHR Decision, Findings of Fact, Conclusions of Law, and Order (Jan. 25, 1975) at 4. *See also* Comment, "Wisconsin's Fair Employment Act: Coverages, Procedures, Substance, Remedies" 1975 Wis. L. Rev. 696, 719.

[8] *Liberty Trucking Co. v. DILHR,* 10 Empl. Prac. Dec. 6260 (Case No. 146-332, Dane County Cir. Ct. 1975).

liberally construed to effect its broad purpose of eliminating practices which have a discriminatory impact, as well as those practices or policies which are facially or overtly discriminatory. *Wisconsin Telephone Co. v. ILHR Dept.*, 68 Wis.2d 345, 368, 228 N.W.2d 649 (1975); *Ray-O-Vac, Inc. v. ILHR Department*, 70 Wis.2d 919, 236 N.W.2d 209 (1975).

This court followed *Ray-O-Vac, supra,* in *Goodyear Tire & Rubber Co. v. DILHR,* 87 Wis.2d 56, 273 N.W.2d 786 (Ct. App. 1978) and held that Wisconsin's WFEA gave women greater protection than that afforded under the federal Act. *Goodyear,* 87 Wis.2d at 81, 273 N.W.2d at 799. In that case we interpreted *Ray-O-Vac, supra,* to require "that individuals [be] treated as individuals, and equally . . . even if they may have disabilities arising out of factors peculiar to their sex." *Id.* at 66, 273 N.W.2d at 792. We think the same logic applies here, with respect to individuals who have religious needs peculiar to a minority creed.

The examiner ruled that the appellant employer had the burden of proving that accommodating complainant's religious practices would place an undue hardship upon it as an employer. As discussed in part III of this opinion, appellant offered no evidence of cost to it in accommodating complainant through a slight adjustment to its training schedule. Its witnesses testified only that the adjustment was "inconvenient." There was no evidence as to the impact of the adjustment upon other employees, which may be the reason why the examiner limited the issues to the effect upon the employer.

We hold that the Wisconsin Fair Employment Act requires employers to make reasonable accommodations to their employees' religious practices, that the burden of proving that a reasonable accommodation cannot be made

is upon the employer, and that the burden is not met by showing inconvenience to the employer. It may be that a possible accommodation may be made at no expense or inconvenience to the employer but that it would result in considerable inconvenience to other employees. It may be that a possible accommodation could adversely affect customer or contractual relations. Whether accommodation under those or other circumstances would be reasonable will depend upon the circumstances of each case.

We recognize that 42 U.S.C.S. sec. 2000e(j) of the Equal Employment Opportunity Act incorporates a test of "undue hardship on the conduct of the employer's business." Whether such a test should be incorporated into this state's reasonable accommodation requirement is a question we need not and do not reach since the record of this case shows no hardship to anyone from the accommodation here imposed.

## II. *Establishment Clause*

AMC contends that this construction violates the establishment clause of the first amendment to the United States Constitution[9] and art. I, sec. 18 of the Wisconsin Constitution,[10] by requiring employers to give preferen-

---

[9] The *U. S. Const.* amend. I, provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[10] The Wis. Const. art. I, sec. 18, provides:

The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any

tial treatment to members of minority sects, and thus to discriminate against other employees; by providing a form of "state aid" to religion; and by requiring excessive entanglement of the state with religion. Though there is force to this argument, which presents difficult and complex issues under the prior federal and Wisconsin cases applicable to them, we conclude that the argument does not survive a close analysis on the facts of this case.

The Wisconsin Supreme Court has recently noted that despite the different wording of the federal and state constitutional provisions respecting religion, both are intended to effect the same objects of preventing the government from "establishing" religion and preserving to individual citizens the right to exercise their religious beliefs freely. *State ex rel. Wisconsin Health Facilities Authority v. Lindner,* 91 Wis.2d 145, 280 N.W.2d 773 (1979). Consequently, it has employed the tests enunciated by the United States Supreme Court in construing the requirements of the establishment clause to determine whether specific state laws or actions are violative of either constitutional provision. *Wisconsin Health Facilities Authority v. Lindner,* 91 Wis.2d 145, 280 N.W.2d 773 (1979); *State ex rel. Holt v. Thompson,* 66 Wis.2d 659, 225 N.W.2d 678 (1975); *State ex rel. Warren v. Nusbaum,* 55 Wis.2d 316, 198 N.W.2d 650 (1972); *State ex rel. Warren v. Reuter,* 44 Wis.2d 201, 170 N.W.2d 790 (1969).

In *Wisconsin Health Facilities, supra,* the court used the three-pronged test enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971) and *Committee for Public Education v. Nyquist,* 413 U.S. 756, 773 (1973) as the

---

money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

"best guidance on the application of the Establishment Clause," though noting that a majority of the United States Supreme Court had rejected it in *Wolman v. Walter,* 433 U.S. 229 (1977). 91 Wis. at 152 n. 1, 280 N.W.2d at 777 n. 1. Under this test (hereafter referred to as the *Nyquist* test) the law in question must: (1) reflect a clearly secular legislative purpose; (2) have a primary effect which neither advances nor inhibits religion; and (3) avoid excessive governmental entanglement with religion. The principle underlying all three of these prongs is that the government should remain neutral in all matters concerning religion. As the court held in *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 745–46, 747–48 (1976) :

Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity. Of course, that principle is more easily stated than applied. The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity. . . . The Court also has taken the view that the State's efforts to perform a secular task, and at the same time avoid aiding in the performance of a religious one, may not lead it into such an intimate relationship with religious authority that it appears either to be sponsoring or to be excessively interfering with that authority. [Quoted with approval in *Wisconsin Health Facilities,* 91 Wis.2d at 151, 280 N.W.2d at 777.]

As Justice Harlan once observed, however, "[n]eutrality . . . is a coat of many colors." *Board of Education v. Allen,* 392 U.S. 236, 249 (1968). No claim is made that a governmental prohibition against religious discrimination in private employment offends the establishment clause. The attack on this appeal is solely directed to the positive duty placed on employers to make reasonable accommodations for the free exercise of their employees' religious beliefs. Without such a corresponding

duty, the negative prohibition would be rendered meaningless with respect to a wide variety of facially neutral employment practices which have discriminatory impacts. In practical effect, the practicing adherents of minority religions could be locked out of the job market. In that event, the social policies of encouraging full employment, and of protecting individuals from arbitrary discrimination on religious grounds, would be frustrated.

The question before us, then, is whether the reasonable accommodation required under the Act as we have construed it, and as applied to the facts of this case, violates the fundamental concept of neutrality or any of the three more specific requirements of the *Nyquist* test. It is not an easy question. It was avoided by the United States Supreme Court in *Trans World Airlines v. Hardison,* 432 U.S. 63 (1977), which assumed the validity of the accommodation requirement in holding, under the facts of that case, that it had not been violated. It was decided adversely to AMC's position in the only significant federal case yet to address the issue in *Cummins v. Parker Seal Company,* 516 F.2d 544 (6th Cir. 1975) [11] over a strong dissent by Judge Celebrezze. It was decided favorably to that position by a federal district court in *Gavin v. Peoples Natural Gas Company,* 464 F.

---

[11] In *Cummins,* the majority found no Establishment Clause violation in the federal religious accommodation requirements, 29 C.F.R. sec. 1605.1 (1974) and 42 U.S.C. sec. 2000e(j) utilizing the three-pronged test of *Committee for Public Education v. Nyquist,* 413 U.S. 756, 773 (1973).

In *Hardison v. Trans World Airlines,* 375 F. Supp. 877, 887–88 (W.D. Mo. 1974) the federal district court dismissed the constitutional question with a half page analysis. The Eighth Circuit Court of Appeals upheld the district court's ruling on the constitutional issue relying upon *Cummins, supra,* 527 F.2d 33 (8th Cir. 1975).

In *Tooley v. Martin-Marietta Corp.,* 476 F. Supp. 1027, 20 Fair Empl. Prac. Cas. 1487, No. 76–933, (D. Ore. 1979), the district court disposed of the constitutional issue with little discussion.

Supp. 622 (D. Pa. 1979).[12] Of the state supreme courts which have found a duty to accommodate,[13] only California has confronted the constitutional issue.[14] That court found no violation of the establishment clause, over a strong dissent by three of its seven justices. The commentators are in wide disagreement.[15]

[12] In *Gavin* the court found that the federal religious discrimination statute, 42 U.S.C. sec. 2000e(j), violated the establishment clause under the facts of the case which involved the claims of a Jehovah's Witness that raising and lowering the American flag as part of his job violated his religious convictions. The court said that the statute violated the third prong of the *Nyquist* test, *supra*, in that excessive government entanglement would ensue if a court would have to rule on the validity of a claimant's religious beliefs in a religious discrimination suit.

[13] The courts of California, Alaska and Maine have found such a duty. *Rankins v. Commission of Professional Competence of Ducor*, 154 Cal. Rptr. 907, 593 P.2d 852, (1979); *Wondzell v. Alaska Wood Products, Inc.*, 583 P.2d 860 (Ala. 1978); *Maine Human Rights Commission v. Local 1361, United Etc.*, 383 A.2d 369 (Me. 1978).

[14] In *Rankins v. Commission of Professional Competence of Ducor*, 154 Cal. Rptr. 907, 593 P.2d 852 (1979) the California Supreme Court found no Establishment Clause violation because "the purpose and the primary effect [of the California constitutional provision against religious discrimination in employment] . . . are not to favor any religion but to promote equal employment opportunities for members of all religious faiths." 593 P2d at 858–59.

[15] *See, e.g.*, Wheeler, "Establishment Clause Neutrality and the Reasonable Accommodation Requirement," 4 Hastings Const. L.Q. 901, 931–34 (1977). The author contends that a reasonable accommodation rule is constitutional as seen under a theory of benevolent governmental neutrality. *Cf.* Note, "Can the Government Require Accommodation of Religion at the Private Job-Site?" 62 Va. L. Rev. 237, 248 (1976); Comment, "Title VII and Religious Discrimination: Is any Accommodation Reasonable Under the Constitution?" 9 Loyola Univ. L.J. 413 (1978); Comment, "Religious Discrimination in Employment—The Undoing of Title VII's Reasonable Accommodation Standard;" 44 Brooklyn L. Rev. 598 (1978).

Conceding, as we must, that the issue is a close one, we conclude that the accommodation requirement here imposed is not unconstitutional. A contrary holding would render the statutory prohibition against grounding employment decisions on religious factors a toothless, empty gesture of support for a constitutional principle favoring the free exercise of religion which could not be enforced in practice. We do not believe the establishment clause compels this anomalous result under the three prongs of the *Nyquist* test, for the reasons that follow.

## SECULAR PURPOSE

The purpose of WFEA, and of the accommodation requirement implicit in its provisions, are the same: to prevent discrimination in the job marketplace based upon legally irrelevant factors, including creed. We discern no legislative purpose, direct or indirect, to advance one religion over another or religion in general over the philosophies of non-believers. The object is to require employers to adopt the same position of neutrality towards the religious beliefs and practices of their employees as the state must observe with respect to religion in general. There is no requirement that the employer join in those beliefs or condone practices which seriously infringe on business needs. The requirement is merely that the employer maintain a "hands off" stance when religious practices can be accommodated without unreasonable inconvenience. We conclude that the purpose of the accommodation requirement meets the first prong of the *Nyquist* test.

## PRIMARY EFFECT

The appellant contends that the effect of the accommodation requirement is to advance religion by requiring

preferential treatment for the religious practitioner, to the disadvantage of other employees. This argument incorrectly assumes that "accommodation" requires an employer to grant its religious employees special privileges or benefits—here, for instance, in the form of time off—which are not conferred on other employees. No such unequal treatment is involved in this case.

In construing the accommodation requirements in the Civil Rights Act in *Trans World Airlines v. Hardison,* 432 U.S. 63 (1977), a majority of the Supreme Court held that none of the proposed means of accommodating the employee's need for Saturday-Sabbath time off were reasonable, since all of them involved assigning other employees to cover his absence either in violation of a labor agreement (and in disregard of the rights and preferences of such employees) or at preferential rates of pay. A majority of the court held that the Act did not require unequal treatment of employees,[16] and concluded:

---

[16] Justice Marshall and Justice Brennan are apparently untroubled at the prospect of disparate treatment of employees based on religious grounds. Marshall (joined by Brennan) observed in his dissent in *Trans World Airlines, supra,* after reviewing many cases exempting religious persons from various state-imposed requirements:

If the state does not establish religion over non-religion by excusing religious practitioners from obligations owed the state, I do not see how the State can be said to establish religion by requiring employers to do the same with respect to obligations owed the employer. Thus, I think it beyond dispute that the Act does— and, consistently with the First Amendment, can—require employers to grant *privileges* to religious observers as part of the accommodation process. 432 U.S. at 90–91. (Emphasis supplied.)

*Cf.,* Judge Celebrezze's dissent in *Cummins v. Parker Seal Company,* 516 F.2d 544, 560 (6th Cir. 1975):

"[I] believe that religious discrimination in employment must end. . . . In pursuit of this objective, I cannot condone a rule that mandates discrimination on the basis of religion. This rule

Like abandonment of the seniority system, to require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion . . . . While incurring extra costs to secure a replacement for Hardison might remove the necessity of compelling another employee to work involuntarily in Hardison's place, it would not change the fact that the privilege of having Saturdays off would be allocated according to religious beliefs.

[T]he paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment. In the absence of clear statutory language or legislative history to the contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath. 432 U.S. at 84–85.

In this case, the employer has not demonstrated that it would be forced to incur any expense or to discriminate against any other employee in granting the requested leave of absence. There is nothing in the accommodation requirement, reasonably applied, to prevent the employer from charging the days taken for religious reasons against the employee's normal vacation time, from requiring that the missed work be made up at another time, from refusing to pay the employee for work not performed, or from refusing to employ a form of accommodation which would infringe on the rights of other employees.

We conclude that an accommodation which can be so easily made as that here at issue, and without affecting the rights of other employees, cannot be said to have the primary effect of advancing or of hindering religion. We therefore hold that legislation requiring such forms of accommodation does not violate the second prong of the *Nyquist* test.

---

breaches the neutrality principle which is at the heart of the First Amendment."

## ENTANGLEMENT

The third prong of the *Nyquist* test presents a closer question. The contention here is that any form of accommodation potentially requires the resolution by the courts of threshold issues concerning doctrinal requirements of specific religions, and the sincerity of the beliefs claimed to be held by individual employees. The difficulty of the issue is illustrated in the case of *Gavin v. Peoples Natural Gas Co.*, 464 F. Supp. 622, (D. Pa. 1979), which involved a Jehovah's Witness discharged for his refusal to raise and lower the company's American flag. The employee claimed the task was in violation of his religious belief that it was sinful to worship false idols. The trial court observed:

At a minimum, were this case to be tried, we would have to determine whether the belief asserted is to be characterized as a "religious" belief, and whether such a belief, which may be outside the standardized creed of his faith, is protected under the Act.

. . . .

We shudder at (and believe the First Amendment would be shaken by) [the prospect of] a courtroom scene wherein experts would be cross-examined as to the legitimacy of a specific religious conviction. 464 F. Supp. at 631–32.

The court found that the 1972 amendment "cannnot constitutionally be applied to the case before us" since it would unduly entangle the government in making religious determinations. 464 F. Supp. at 632.

Though the concern expressed in *Gavin* is legitimate, we believe it is not warranted by the facts of this case. Neither the sincerity of this employee's beliefs, nor the requirement of his religion that he refrain from work on certain holy days is at issue, though testimony concerning them was received. We concur with the majority of the Sixth District Court of Appeals which said in *Cummins v. Parker Seal Company*, 516 F.2d at 554:

In most cases, [these issues] probably will not be disputed seriously. To the extent that the question does arise, however, we think that it will require no more government involvement in religion than the concededly nonexcessive entanglement that occurs when a state must determine whether a purported church qualifies for a property tax exemption. *See Walz v. Tax Comm'n*, 397 U.S. 664, 674–76, 90 S. Ct. 1409, 25 L. Ed.2d 697 (1970) ; *id.* at 698–99, 90 S. Ct. 1409 (opinion of Harlan, J.).

Though another case might compel a different result, we conclude on the facts of this case that the accommodation requirement does not offend the third prong of the test set forth in *Nyquist*.

## *OVERALL NEUTRALITY*

In *Meek v. Pittenger*, 421 U.S. 349 (1975), the court noted some inherent limitations in the three-pronged *Nyquist* test, and said that it should "serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Id.* at 359. In *Walz v. Tax Commission*, 397 U.S. 664 (1970), the court upheld a New York statute exempting religious institutions from real property taxes, and stated the general principle of the first amendment cases as follows:

[W]e will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference. *Walz, supra,* at 669.

The concept of "benevolent neutrality," as opposed to one of "strict" or "absolute neutrality" urged by some,[17]

---

[17] *See generally*, Wheeler, "Establishment Clause Neutrality and the Reasonable Accommodation Requirement," 4 Hastings Const. L. Q., 901, 910, *et seq.* (1977).

avoids the conclusion that the state is powerless to do more than stand back in silent disapproval while its anti-discrimination policies are violated. To adopt the absolutist position would be to view the First Amendment as though it read: "Congress [and the state] shall make no law respecting an establishment of religion, or prohibiting *or in any way protecting* the free exercise thereof."[18] Under such a view many forms of religious accommodation previously upheld under the establishment clause would probably be invalid.[19]

If the state has the power to prohibit religious discrimination in the private sector, then we believe it must necessarily have the power to enforce the prohibition. If it has the power to prevent direct and deliberate forms of religious discrimination, then it must, under the reasoning of *Griggs v. Duke Power, supra,* and *Ray-O-Vac, supra,* have the power to prevent the indirect forms of discrimination involved in the facially neutral employment practices which have, in application, a discriminatory effect.

Where such protective power may be exercised by the slight form of accommodation required by the facts of this case, we believe that the principle of neutrality underlying the First Amendment establishment clause is not violated. In so holding, we do not rely on those cases

[18] The Fourteenth Amendment to the United States Constitution makes the First Amendment applicable to the states. *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964).

[19] *See, e.g., Walz v. Tax Commissioner,* 397 U.S. 664 (1970) [property tax exemption for religious organizations upheld]; *Zorach v. Clauson,* 343 U.S. 306 (1952) [statute allowing "relief time" from public education for religious education upheld]; *Gillette v. United States,* 401 U.S. 437 (1971) [conscientious objector exception in Military Selective Service Act upheld as not violative of the establishment clause]. *State ex rel. Holt v. Thompson,* 66 Wis.2d 669, 225 N.W.2d 678 (1974) [Wisconsin's release-time-for-religious-instruction statute upheld].

which have required more radical forms of accommoda-
tion, in arguable violation of the rights of other employ-
ees.[20] Those cases present different questions than are
presented by this case.

### III.   *Duty to Accommodate on These Facts*

The appellant urges that the employee was not fired
for his religious beliefs, but because he was deceptive in
failing to disclose his special needs at an earlier time.
It also claims that no reasonable accommodation could
have been made without undue hardship to the employer.

Although there is some evidence to support the first
claim, there is also evidence to support the department's
finding that the discharge was discriminatory.  The em-
ployee testified that he had not revealed the conflict
between his training schedule and the religious holy days
at the orientation meeting on July 7, 1972 because he did
not wish to discuss his personal beliefs in front of the
other trainees.  He stated that he waited for an oppor-
tunity to speak with the personnel manager in private,
and that none arose prior to August 7, 1972, when he
disclosed his religious needs.

It is undisputed that this disclosure was made almost
a month and a half before the requested leave of ab-
sence.  It is also undisputed that the employee was not
discharged at the time of disclosure, but was given the

[20] *See, e.g., Draper v. United States Pipe & Foundry Co.*, 527
F.2d 515 (6th Cir. 1976) [employer must accommodate employee's
religious practices despite the effect shift adjustments would have
on other employees]; *McDaniel v. Essex Intern., Inc.*, 571 F.2d 338
(6th Cir. 1978); *Tooley v. Martin-Marietta Corp.*, 476 F. Supp.
1027, 20 FEP Cases 1478, slip op. no. 76–933 (D. Ore. 1979), *Maine
Human Rights Comm'n v. Local 1361, United, Etc.*, 383 A.2d 369
(Me. 1978) [union and employers must attempt to accommodate
employees who refused to pay union dues on religious grounds].

choice of keeping his job or observing his religious convictions. Under these circumstances, we conclude that the department's findings are supported by substantial evidence and must be upheld. Sec. 227.20 (6), Stats., *Chicago M., St. P. & P. RR. C. v. ILHR Dept.*, 62 Wis.2d 392, 215 N.W.2d 443 (1974), *Robertson Transport Co. v. Public Serv. Comm.*, 39 Wis.2d 653, 159 N.W.2d 636 (1968).

The case of *Ferguson v. Kroger Co.*, 16 Empl. Prac. Dec. 8240 (S.D. Ohio 1979), cited by the appellant, is not on point. There the employee sought a two-week leave of absence to attend a similar religious convention only three days before it commenced, and one week after her return from a vacation originally scheduled to coincide with the convention, but later rescheduled by the employee. The employer had made reasonable efforts to accommodate the employee's religious observances throughout her lengthy term of employment.

The appellant's claim that the form of accommodation required in this case would have constituted an unreasonable interference with its training schedule is without merit. The burden of proving that no reasonable accommodation could be made is on the employer once the employee has established a *prima facie* case of discrimination. *Redmond v. GAF*, 574 F.2d 897 (7th Cir. 1978). As the court stated in that case:

The term "reasonable accommodation" is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of "reasonableness" under the unique circumstances of the individual employer-employee relationship. The trier of fact is in the best position to weight these considerations. 574 F.2d at 902–03.

In *Redmond, supra,* as in this case, the employer made no effort to accommodate an employee who asserted a

religious duty to teach a Bible study class on Saturdays, and gave him the choice of working scheduled overtime or being discharged. It was held that the employer had failed to meet its burden of proving undue hardship.

In this case, AMC took the position from the beginning that it had no duty to accommodate. It offered no evidence that it would incur any cost or that significant disruption would result from making a slight adjustment in its training schedule. Its officials testified that this adjustment was possible, though "inconvenient." The evidence demonstrates that a much more significant adjustment was made for another employee in the same training program who had been removed to perform an assignment elsewhere in the plant for several weeks and was allowed to make up the lost training time at a later date. We hold that AMC failed to meet its burden of proving that the accommodation here at issue was unreasonable.

## IV. *Back Pay*

An award of back pay was not a remedy for acts of discrimination in violation of WFEA until June 16, 1974, the effective date of ch. 268, Laws of 1973. This amendment to the Act was silent as to whether it was prospective or retroactive in effect. The trial court held that the department exceeded its authority in awarding back pay in this case, since the discriminatory discharge took place on August 18, 1972.

In *Yanta v. Montgomery Ward & Co., Inc.*, 66 Wis.2d 53, 61, 224 N.W.2d 389, 393 (1974), the supreme court stated that the amendment "represents a legislative determination that the statutory rights of those discriminated against were not adequately protected by the availability of prospective relief only." That case held that

the legislation created a private cause of action for wages lost because of a discrimination occurring prior to its effective date.

This court, relying on *Yanta,* recently held that the amendment also applies retroactively with respect to departmental awards. *Chicago & North Western Railroad v. Labor & Ind. Rev. Comm.,* 91 Wis.2d 462, 476, 477, 283 N.W.2d 603, 613 (Ct. App. 1979). That part of the trial court's judgment denying the award must be reversed and the judgment modified accordingly.

*By the Court.*—Judgment affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

DYKMAN, J. *(concurring).* I concur with the majority holding that the WFEA imposes a duty of reasonable accommodation on the employer and that the defendant AMC did nothing to reasonably accommodate the employee in this case.

My agreement with the majority's conclusion concerning the first amendment establishment clause issue is a guarded one. Although the majority does not explicitly adopt a test to determine whether an accommodation is reasonable or creates a hardship, the United States Supreme Court in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), indicated that only minimal efforts could be required of employers. In *TWA,* the most recent United States Supreme Court discussion of the requirements of reasonable accommodation, the court used the statutory test of "undue hardship" to define the parameters of the employer's duty to reasonably accommodate employees' religious beliefs under Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. sec. 2000e (i). The court limited that duty to incurring only de minimis costs when it said at page 84: "To require TWA

to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship."

I interpret *TWA* as suggesting that the maximum coercion a state may constitutionally apply to an employer is tested by a "de minimis" standard. Any higher standard required by the statute would affect the overall neutrality of the statute by forcing an employer to prefer members of one religion over those of another, thus producing an infringement of the establishment clause.

On the record before us, it is impossible to determine what cost AMC would have had to bear had it accommodated Bartell's request. Its director of industrial relations testified that were Mr. Bartell allowed to attend his church's convention, it would have been an inconvenience to AMC, but it could have been done. AMC's supervisor of central stores testified that had Mr. Bartell been allowed to attend the convention, his training program would have been elongated. There was no testimony as to what economic cost AMC would have faced had it allowed Mr. Bartell to attend the convention. It is not difficult to show a de minimis cost, but AMC did not do so.

I concur only because the standard for the extent of reasonable accommodation required is the "de minimis" test expressed in *TWA*.

DAY, J., took no part.