Patricia Smith KING and Joseph J. King, Jr., Plaintiffs-Appellants,†

v.

VILLAGE OF WAUNAKEE, a Wisconsin municipal corporation, Maureen O'Malley, Jeff Murphy, Dennis Sweno, Patrick Gile, Patrick Strickland, Paul Holmes and Suzanne Matiash, Defendants-Respondents.

Court of Appeals

*No. 92-0551.  Oral argument October 29, 1992.—Decided March 11, 1993.*

(Also reported in 499 N.W.2d 237.)

† Petition to review granted.

For the plaintiffs-appellants the cause was orally argued by and submitted of the briefs of *Bronson C. LaFollette* of Madison.

For the defendants-respondents the cause was orally argued by and submitted on the brief of *Craig L. Parshall* of Menomonee Falls; brief was also submitted by co-counsel, *Richard Martin* of Milwaukee.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.    Patricia and Joseph King sued the Village of Waunakee, seeking to enjoin it from displaying a nativity scene in a village park during the Christmas holiday season. The circuit court granted the village's motion for summary judgment and dismissed the action. The Kings appeal.

The issues are whether the village's erection and maintenance of the display each winter violates the

"Establishment of Religion" clause of the First Amendment to the United States Constitution,[1] and, alternatively, whether the village's expenditure of funds for the display violates art. I, § 18 of the Wisconsin Constitution, which prohibits expending public funds "for the benefit of religious societies . . .."

We decide each of these issues against the Kings, and affirm the decision and order of the circuit court.

The facts are not in dispute. For many years prior to 1990, the village displayed a holiday creche in a village owned park near a commercial area several blocks from "downtown" Waunakee. It was a "traditional" creche consisting of a replica of a manger and one-dimensional figures of the infant Jesus, Mary, Joseph, the Magi, shepherds, and several farm animals. The village has in the past and continues to expend public funds to maintain the display.

In November, 1990, Freedom From Religion Foundation, Inc., requested that the creche be removed, claiming that its sponsorship by the village violated the church/state separation provisions of the federal and state constitutions. Acting on the advice of counsel, the village declined to remove it, choosing instead to add to the display by placing colored lights on several large evergreen trees in the immediate background, placing a large five-pointed star on top of a telephone pole behind the display and erecting a large sign next to the creche which reads:

---

[1] The clause states, simply: "Congress shall make no law respecting an establishment of religion . . .." U. S. CONST., amend. I, cl. 1. It is, of course, like other provisions of the Bill of Rights, applicable to the states and their political subdivisions under the Fourteenth Amendment.

During The
HOLIDAY SEASON
The Village of Waunakee
Salutes Liberty

Let These Festive Lights
& Times Remind Us That We Are
The Keepers Of The Flame of Liberty And
Our Legacy of Freedom. Whatever
Your Religion Or Beliefs,
Enjoy The Holidays.

Waunakee Village Board

Shortly after these changes were made, the Kings brought this action. Both sides moved for summary judgment, the Kings seeking a determination that the display was unconstitutional and the village seeking dismissal of the complaint. The trial court, concluding that the display was constitutional in all respects under recent decisions of the United States Supreme Court, granted the village's motion and the Kings appeal. We agree with the trial court that those decisions compel dismissal of the action.

As a preliminary matter, the village argues that the case is moot because the Kings no longer reside in Waunakee and therefore lack standing to challenge the constitutionality of the display. The Village correctly points out that we generally will not entertain an appeal if the issues raised have become moot as to the parties involved in the action. *State ex rel. Ellenburg v. Gagnon,* 76 Wis. 2d 532, 542, 251 N.W.2d 773, 778 (1977) (Abrahamson, J., dissenting). Like most rules, this one has exceptions. We will, for example, entertain a moot case when the issues are of significant public import or are

likely to arise again. *Milw. Prof. Firefighters Local 215 v. City of Milwaukee*, 78 Wis. 2d 1, 15, 253 N.W.2d 481, 488 (1977); *Mueller v. Jensen*, 63 Wis. 2d 362, 367, 217 N.W.2d 277, 279 (1974). We think this is such a case.

Since the early 1980's there has been a significant increase in the number of cases challenging religious displays erected and maintained by cities and towns across the country during the Christmas holiday season. Because similar controversies are likely to arise in the future, and because of the lack of reported Wisconsin cases on the subject, a decision in this case can help define the constitutional issues and thus avoid needless litigation. So, while the Kings may have lost their standing to sue when they moved away, the public interest in a decision on the merits of their claim leads us to conclude that it is appropriate to take up and decide those issues.

The purpose of the Establishment Clause "is to prevent, as far as possible, the intrusion of either [the church or state] into the precincts of the other." *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971). In *Lemon*, the United States Supreme Court devised a three-part analysis to determine whether a particular governmental action can survive an Establishment Clause challenge. The analysis—the "*Lemon* test"—proceeds as follows: "First, the [governmental action] must have a secular . . . purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [action] must not foster 'an excessive government entanglement with religion.' " *Id.* at 612–13 (citations omitted). Because the Kings do not argue that the village's sponsorship of the display violates the first or third elements of that test, we consider only whether its

primary or principal effect either advances or inhibits religion.

The second element of the *Lemon* test has become the linchpin of Establishment Clause jurisprudence, and the Supreme Court has had frequent opportunities to consider the issue in recent years. Its decisions, however, frequently involve a plethora of opinions, revealing shifting majorities and engendering more than a little difficulty in ascertaining who speaks for a majority in a given case. We consider three such cases to frame and resolve the questions presented here: *Lynch v. Donnelly*, 465 U.S. 668 (1984), *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573 (1989), and *Lee v. Weisman*, 120 L.Ed.2d 467 (1992).

The first, *Lynch*, involved a challenge to a Christmas display in a city park in Pawtucket, Rhode Island, which included a display similar to that erected in Waunakee: a creche accompanied by a variety of "secular" figures such as a Santa Claus and reindeer, large candy canes, clowns, animals, and many colored lights. Viewing the display "in the context of the Christmas season," and emphasizing the historic "role of religion in American life," a majority of the Court concluded that it did not violate the Establishment Clause because of its underlying secular purpose. *Lynch*, 465 U.S. at 674, 679, 685.

Writing separately, although joining in the majority opinion, Justice O'Connor analyzed the issue in terms of whether the city, by maintaining the display, had "endorsed" a particular religion—Christianity—by "making adherence to [that] religion relevant in any way to a person's standing in the political community." *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring). Such conduct, according to Justice O'Connor, "sends a message to nonadherents that they are outsiders, not full

members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Id.*

Concluding that "[t]he evident purpose of including the creche in the larger display was not promotion of [its] religious content . . . but [a] celebration of the public holiday through its traditional symbols," Justice O'Connor agreed that the Pawtucket display did not violate the Establishment Clause. *Lynch,* 465 U.S. at 691, 104 S.Ct. at 1369 (O'Connor, J., concurring).

In *Allegheny,* the American Civil Liberties Union sued to enjoin the display of two recurring holiday decorations in Pittsburgh: a creche and a Chanukah menorah. While the majority decided that the creche violated the clause and the menorah did not, five justices agreed that the appropriate test was the "endorsement" analysis outlined by Justice O'Connor in *Lynch.* Writing for the *Allegheny* majority, Justice Blackmun said:

> In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion, a concern that has long had a place in our Establishment Clause jurisprudence.
>
> . . . Thus, it has been noted that the prohibition against governmental endorsement of religion "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred.* . . ."
>
> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits a government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community."

*Allegheny,* 492 U.S. at 592–94 (citations omitted) (emphasis in original).

Justice Kennedy, joined by the Chief Justice and Justices White and Scalia, applied a much stricter "coercion" test and concluded that neither display violated the Establishment Clause. They saw the appropriate test not as whether the government action merely "endorses" a particular religion or religious practice, but whether it amounts to an act of "coercion": whether the government's action has the effect of "coerc[ing] anyone to support or participate in any religion or its exercise." *Allegheny,* 492 U.S. at 659 (Kennedy, J., concurring in part and dissenting in part).[2]

Justice O'Connor again wrote separately in *Allegheny,* adding to her earlier discussion of the "endorsement" test:

> We live in a pluralistic society. Our citizens come from diverse religious traditions or adhere to no particular religious beliefs at all. If government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government

---

[2] According to this view, the Establishment Clause does not, as the *Allegheny* majority concluded, require government to "avoid any action that acknowledges or aids religion." 492 U.S. at 657 (Kennedy, J., concurring in part and dissenting in part). Rather, the only prohibition on government is that its "power to coerce" its citizens cannot be "used to further the interests of [a particular religion] in any way." *Id.* at 664. Thus, in the eyes of the *Allegheny* minority, anything short of government "coercion"—such as a situation where the government's recognition or accommodation of religious faith is "passive" and noncoercive—falls "within the realm of flexible accommodation or passive acknowledgement of existing symbols," and thus does not violate the Establishment Clause. *Id.* at 662.

cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community. *Allegheny*, 492 U.S. at 627 (O'Connor, J., concurring).

Rejecting the dissenters' "coercion" test as failing to take into account "the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others," Justice O'Connor agreed that the Pittsburgh creche display sent just such a message to non-Christians in the community and thus "conveyed a message of governmental endorsement of Christian beliefs" in violation of the Establishment Clause. *Allegheny*, 492 U.S. at 627-28, 632, 109 S.Ct. at 3119-20, 3121-22 (O'Connor, J., concurring).

Most recently, the court revisited the issue in *Lee v. Weisman*. *Lee* was not a creche case, but one involving school sponsorship of sectarian prayers at a graduation ceremony. This time the majority concluded—in an opinion written by Justice Kennedy—that the conduct of the school authorities in requiring the students to sit through the religious messages violated the "central principle[ ]" that "government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.' " *Lee*, 120 L.Ed.2d at 480-81. This time, however, Justice Kennedy framed the "coercion" test in broader language. He did not put forth coercion as the *sole* test under the clause, but said only that "*at a minimum*, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise. . .." *Id.* (emphasis added).

Justices Blackmun, Stevens, O'Connor and Souter concurred, indicating that, while coercing or compelling religious practices plainly violates the Establishment

Clause, so does conduct that does not constitute coercion, but only amounts to an endorsement or promotion of religion or religious practices. *Lee*, 120 L.Ed.2d at 491-92 (Blackmun, J., concurring). Finally, Justice Scalia, joined by the Chief Justice and Justices White and Thomas, dissented, taking the position that the only type of activity prohibited by the Clause is coercion "*by force of law and threat of penalty,*" and concluding that required attendance at the prayers did not constitute such coercion. *Id.* at 515 (Scalia, J., dissenting) (emphasis in original).

Thus, while the Court's shifting membership must be considered, it is plain that, prior to *Lee* at least, a majority had accepted Justice O'Connor's "endorsement" analysis as the appropriate test for determining whether governmental conduct in a given case impermissibly advances or inhibits religion under the second element of the *Lemon* test. And while only four of the present members of the Court expressly held to that view in *Lee*, we note that Justice Kennedy, the earlier principal advocate of the "coercion" test, did not join the *Lee* dissenters, but rather suggested in his majority opinion that the Establishment Clause's bar of coerced religious support or recognition is merely the "minimum" constitutional guarantee. Thus, post-*Lee*, it appears that four justices favor a strict "penalty"-oriented coercion analysis as the sole test, four prefer Justice O'Connor's "endorsement" analysis—with freedom from coercion as the minimum guarantee—and one falls somewhere in between.

Because, as will be seen, we believe the Waunakee display does not fail the "endorsement" test adopted by the *Allegheny* majority, we need not consider whether it also fails the more strict "coercion" test.

As we begin the analysis, however, we must note that, under the Court's decisions, determining compliance or non-compliance with the Establishment Clause has necessarily become a process of "line-drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the [government]." *Lee*, 120 L.Ed.2d at 487–88. As a result, courts are forced into a type of case-by-case "architectural jurisprudence" in creche cases: considering the particular display, its setting and all of its physical components, on a piecework basis to determine its compliance with the Supreme Court's developing and sometimes shifting views of the Establishment Clause. We thus consider the Waunakee display in light of those decisions.

In *Lynch*, the Pawtucket display was located in a privately-owned park in the heart of the shopping district and contained—in addition to a traditional creche with figures of the holy family, angels, shepherds, kings and animals—figures of reindeer pulling Santa's sleigh, large candy-canes, a Christmas tree and a variety of other clowns and animal figures, "hundreds of colored lights," and a large banner reading "SEASONS GREETINGS." *Lynch*, 465 U.S. at 671.

The *Lynch* majority began by discussing at some length the historic relationship between religion and government in American life—including Presidential holiday proclamations, the employment of chaplains by the House and Senate, the "In God We Trust" inscription on the nation's currency, and monetary support of "[a]rt galleries . . . display[ing] religious paintings"—and said that it was "unable to discern a greater aid to religion deriving from inclusion of the creche than from these benefits and endorsements previously held not violative of the Establishment Clause." *Lynch*, 465 U.S. at 682. Then, viewing the display as a whole and "in the context

of the Christmas season," the Court balanced its "secular purpose"—which it described as "engender[ing] a friendly community spirit of goodwill . . . bring[ing] people into the central city . . . serv[ing] commercial interests and benefit[ting] merchants and their employees"—and concluded that, notwithstanding its "religious significance," its overall secular purpose overrode any Establishment Clause objections. *Id.* at 685, 687.

*Allegheny*, as we have noted, involved two displays: a creche located on the "grand staircase" of the Allegheny County Courthouse in downtown Pittsburgh, and an eighteen-foot menorah located outside the Pittsburgh City-County building a block away. As indicated, a majority of the Court concluded that the creche display violated the Establishment Clause, but that the menorah did not.

The creche display contained figures of the holy family, farm animals, shepherds and wise men in a manger topped by an angel bearing a banner proclaiming "*Gloria in Excelsis Deo!*" *Allegheny*, 492 U.S. at 580. The manger was surrounded by a small wooden fence decorated with poinsettia plants and small evergreen trees and containing a plaque stating: "This Display donated by the Holy Name Society." *Id.* The menorah, a ceremonial lamp associated with the celebration of Chanukah, was an abstract design approximately eighteen feet tall. It was erected adjacent to a 45-foot decorated evergreen tree outside the city-county building. At the foot of the tree was a sign entitled "Salute to Liberty," bearing the mayor's name and stating:

> During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom. *Id.* at 582.

313

The *Allegheny* majority considered the issue as whether either display, considered in light of its particular physical setting, "ha[d] the effect of endorsing or disapproving religious beliefs." *Allegheny*, 492 U.S. at 597. As for the creche, the court noted that, unlike the situation in *Lynch*, "nothing in the context of the display detract[ed] from [its] religious message," because there were no other figures or objects of attention separate from the creche. *Id.* at 598. The court also noted that the creche sat at the foot of the " 'main' and 'most beautiful part' of the building that is the seat of county government," and, as a result, the government's support and approval of the religious message conveyed by the creche was obvious. *Id.* at 599, 601.

As to the menorah, the majority considered first that it was displayed next to a "Christmas tree," which, it said, was "widely accepted . . . as the preeminent secular symbol of the Christmas holiday season," and thus emphasized the secular component of the menorah and other items in the display. *Allegheny*, 492 U.S. at 617. Considering the preeminence of the tree in the display and the mayor's "explanatory plaque," the majority concluded that it was unlikely that Pittsburgh residents would perceive the combined display as an endorsement or approval of their individual religious choices. *Id.* at 618–20.

Applying those considerations to the Waunakee creche, we conclude that the trial court was correct in its analysis and resolution of the issue.

■

Plainly, a creche is a religious symbol. Our task under *Lemon* and subsequent cases is, however, to look to the context in which it is displayed and determine whether the principal or primary effect of the display as a whole advances or inhibits religion. We begin, as did

the trial court, by noting that the Christmas holiday has at least three bases: historical, religious and commercial; and that, as the trial court stated:

> [t]hese three aspects of the holiday season often blur into one another. Displaying one aspect often connotes the other aspects. Holiday displays often depict or stand for all three. Therefore, absent a very clear message, the determination of the primary or principal effect of a Christmas holiday display is difficult to discern.

■ It is a difficult inquiry in part because, as we have noted above, it is one that calls for line-drawing in an area where no fixed, *per se* rule has been—or can be—framed. *Lynch*, 465 U.S. at 678. It has been said, for example, that whether a display has the effect of endorsing religion involves ascertaining "what viewers may fairly understand to be [its] purpose . . .." *Allegheny*, 492 U.S. at 595. And that understanding must, of necessity, depend upon the particular content and context of the display. *Id.* at 598.

Considering the Waunakee creche in isolation, its content is undeniably religious. However, its context—its location and overall physical setting—is something different. In *Allegheny*, the majority was particularly influenced by the fact that the Pittsburgh creche was located not only inside the seat of the local government, but in the ".main and most beautiful part" of the building. 492 U.S. at 599. And because there also was a near-total absence of secular surroundings, nothing about the context of the display detracted from the religious message conveyed by its major component, the creche. In *Lynch*, of course, the Court reached the opposite result where the creche appeared in the dis-

315

play—which was located in a commercial area removed from government buildings—along with other seasonal (and nonseasonal) secular accouterments, such as evergreens, lights, Santa Claus images and similar objects.

The Waunakee display, while located in a village park, is well removed from any government buildings. The photographs in the record establish that the creche itself is dwarfed by several tall, lighted evergreen trees immediately surrounding it as a backdrop, much as the Pittsburgh menorah was dwarfed by the large Christmas tree in *Allegheny*. Equally imposing in the Waunakee display is the eight-foot sign immediately adjacent to the creche carrying a clear secular message. Again, as in *Allegheny*, the sign "further diminishes the possibility that the [creche] will be interpreted as a[n] . . . endorsement of Christianity . . .." *Allegheny*, 492 U.S. at 619. Rather, it "confirm[s] that in [the] particular context[ ] the government's association with a religious symbol does not represent [its] sponsorship of religious beliefs." *Id.* at 619.[3]

---

[3] The Kings disagree on the effect of the sign. In their view its very language endorses religion. They center on the sign's final sentence: "Whatever your religion or beliefs, enjoy the holidays." They contend that the sign relates only to people *who have* a religion and people *who have* (religious) beliefs and thus wishes those people—and only those people—a happy holiday. Thus, say the Kings, "the message conveyed . . . runs afoul of the endorsement test by 'making adherence to a religion relevant in any way to a person's standing in the community," because it "sends a message" to people *without* religious beliefs "that enjoyment of the holidays is somehow related to religion or [to] beliefs which have religious meanings." We think that stretches the point beyond reason. The sentence may be read equally, if not more persuasively, to send a greeting to persons who have a professed religion of any kind as well as to those whose beliefs—whatever they may be—embrace other spiritual precepts, or none at all. In

It was, obviously, no accident that the Village of Waunakee modified its traditional display in 1990—on the heels of the Supreme Court's decision in *Allegheny*—by adding lights to the creche and surrounding trees, a five-pointed star on a flagpole behind the creche, and the large "liberty" sign—almost a *verbatim* reproduction of the sign in the Pittsburgh menorah display—immediately adjacent to the creche. It was a plain attempt to conform to the most recent pronouncement on the subject by the nation's highest court, and we believe it succeeded.

Given the location of the Waunakee display in a commercial area, removed from any government buildings, and given the creche's dominance by the tall lighted trees, the flagpole star, and the sign confirming the secular purpose of the display, we conclude, as did the trial court, that the display, considered in its entirety, does not amount to an endorsement of religion under the cases we have discussed, and thus does not violate the First Amendment to the United States Constitution.[4]

---

other words they greet and treat both believers and non-believers equally. We do not see such a constructed ambiguity as in any way diluting the secular content of the sign, much less turning it into a sectarian endorsement of religion or religious beliefs.

[4] The Kings also argue that the trial court erred by failing to consider the "history and ubiquity" of the display—particularly the fact that the village had, in pre-*Allegheny* years, exhibited an unadorned creche, and continued to do so until 1990 when, after complaints from the Freedom From Religion Foundation, it added the "secular" features. They maintain that the trial court should have concluded—as should we—that that history constitutes a long-standing endorsement of the Christian religion by the Village of Waunakee. The argument is based on a comment in Justice O'Connor's *Allegheny* concurrence that "the 'history and ubiquity' of a practice" is relevant to the endorsement test inquiry

317

Finally, the Kings claim that the Waunakee display violates the Wisconsin Constitution because use of village funds to erect and maintain it violates the ban on the use of public funds "for the benefit of religious societies . . .." WIS. CONST. art. I, § 18.

The cited section is, of course, the Wisconsin counterpart to the federal Establishment Clause. *State ex rel. Holt v. Thompson*, 66 Wis. 2d 659, 676, 225 N.W.2d 678, 687 (1975). "While [the] words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *State ex rel. Warren v. Nusbaum*, 55 Wis. 2d 316, 332, 198 N.W.2d 650, 658 (1972).

As a result, we interpret and apply art. I, § 18 in light of United States Supreme Court cases interpreting the Establishment Clause. *American Motors Corp. v.*

---

because it "provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message [endorsing] religion." *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring).

We note first that Justice O'Connor's "history and ubiquity" statements were not adopted or referred to in the majority opinion in *Allegheny*. Even so, as O'Connor indicated, the history and ubiquity of a display is only one of many factors to be considered in the endorsement analysis; it is by no means controlling. Here, as we have noted, the village modified the display in 1990 to ensure that it passed muster under the Supreme Court's most recent statements of the law; and, as we have also noted, we believe it was successful in that endeavor. And neither the fact of that modification nor the appearance of the display in prior years—prior to the time this action was commenced—changes our opinion in that regard.

*ILHR Dept.*, 93 Wis. 2d 14, 29, 286 N.W.2d 847, 854 (Ct. App. 1979), *rev'd on other rounds*, 101 Wis. 2d 337, 305 N.W.2d 62 (1981). We have, of course, considered and applied those cases in arriving at our conclusion that the Waunakee display passes federal constitutional muster.

And while the Kings have referred us to language in an earlier Wisconsin Supreme Court case, *State ex rel. Reynolds v. Nusbaum*, 17 Wis. 2d 148, 165, 115 N.W.2d 761, 770 (1962), suggesting that the Establishment Clause "lends itself to more flexibility of interpretation" than the "religious benefit" clause of the Wisconsin Constitution, the Wisconsin court has not elaborated on that statement in any subsequent case cited to us. We decline the Kings' invitation to set sail on such uncharted seas.

We have concluded, under the guidance of the most recent decisions of the United States Supreme Court, that Waunakee's maintenance of. the holiday display does not violate the Establishment Clause; and because Wisconsin precedent tells us these decisions are also persuasive on claims involving art. I, § 18 of our own constitution, we reach a similar result with respect to the Kings' alternative claim..

*By the Court.*—Judgment affirmed.